# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-01481-COA

JERRY DEUNTAY CARR A/K/A BOOTCHIE                    APPELLANT
A/K/A JERRY CARR

v.

STATE OF MISSISSIPPI                                              APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/12/2014 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| |     ERIN ELIZABETH PRIDGEN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR ANY OTHER TYPE OF EARLY RELEASE, TO RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED |
| DISPOSITION: | AFFIRMED - 11/24/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., MAXWELL AND JAMES, JJ.**

**MAXWELL, J., FOR THE COURT:**

¶1.     The Sixth Amendment to the United States Constitution guarantees a criminal

defendant both the right to confront and cross-examine the witnesses against him and the

right to a fair trial by an impartial jury. In Jerry Deuntay Carr's trial for capital murder, we find both of those rights were protected.

¶2. Contrary to Carr's assertion, there was no Confrontation Clause violation, despite the fact the DNA analyst who testified was not the one who actually tested the blood samples. The testifying analyst had reviewed all testing procedures, performed his own analysis, and signed the final DNA report. So any questions Carr may have had about the accuracy of this report could have been lodged against this witness on cross-examination.

¶3. There was also no violation of Carr's right to an impartial jury. For the first time on appeal, Carr challenges the circuit judge's irregular procedure for selecting regular jurors and alternates. But "[w]here there is no evidence to show that the defendant was not, in fact, tried by a fair and impartial jury, 'error may not be predicated for an irregularity in drawing or impaneling the jury.'"[1] Here, Carr has not even argued—let alone provided evidence to show—the irregular jury-selection procedure led to an impartial jury. Thus, we find no plain error.

¶4. We affirm the judgment convicting Carr of capital murder and sentencing him to life imprisonment.

### Background Facts and Procedural History

**I.      Robbery**

¶5. On the afternoon of July 29, 2010, the Friars Point Police Department responded to a call that someone "fell out" in Simmons Package Store. When the first officer arrived, he

---

[1] *Havard v. State*, 986 So. 2d 333, 336 (¶11) (Miss. 2007) (quoting *Davis v. State*, 660 So. 2d 1228, 1261 (Miss. 1995)).

found Gerald Simmons lying on the floor behind the cash register. The cash register was open, with no cash in it. Simmons was badly injured. His head was oozing blood, which was on his clothes and spattered on the floor. On Simmons's shirt was a bloody footprint. The door to the store had been left wide open. And according to the officer, the scene appeared to be a robbery.

¶6. That same afternoon, Tyonda Tinner watched her roommate, Brymon Hamp, and Hamp's friend, Jerry Carr, walk toward Friars Point. They returned thirty minutes later with a case of gin, which they loaded in the back of Hamp's black Chevrolet Caprice.

¶7. As a condition for living with Tinner, Hamp had been responsible for the gas bill. But he had no money and no job, so the bill went unpaid, and the gas had been cut off weeks earlier. But after putting the gin in the car, Hamp told Tinner he now had money for the gas bill. Hamp and Carr started to leave. Tinner was afraid Hamp would not actually pay her the gas money. So she got in the car with them.

¶8. Hamp started spending money around town—getting his cell phone turned back on and replacing his spare tire. Hamp told Tinner he had robbed Simmons, knocking him on the head to get the money out of Simmons's pocket. Carr chimed in too. He said he was the one who stole the money from the cash register. The two men then dropped off Tinner somewhere outside of Friars Point, where her sister picked her up.

## II. Arrest and Indictment for Capital Murder

¶9. A BOLO[2] had gone out for Hamp's Caprice. Coahoma County sheriff's deputies

---

[2] "Be on the lookout."

spotted the vehicle and initiated a traffic stop. Once the car was pulled over, the deputies noticed the case of gin, along with a bottle of vodka. They also saw blood on Hamp's shoe. They arrested both Hamp and Carr and collected their clothes and shoes. These items were sent to the Mississippi Crime Laboratory. Hamp's clothes tested positive for blood, which later was matched to Simmons's DNA. At the time of arrest, Hamp had $304 in cash, and Carr had $282.

¶10. Eight days later Simmons died from his injuries.

¶11. Hamp and Carr were indicted for killing Simmons in the commission of a robbery. *See* Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2015) (defining capital murder as "[t]he killing of a human being without the authority of law[,] . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery"). Their cases were severed before trial.

### III. Trial

#### A. Jury Selection

¶12. At Carr's separate trial, both the State and Carr's defense counsel were given twelve peremptory challenges. *See* URCCC 10.01 (providing for twelve peremptory challenges when "the punishment may be death or life imprisonment"); Miss. Code Ann. § 99-17-3 (Rev. 2015) ("In capital cases the defendant and the state shall each be allowed twelve peremptory challenges."). Because the circuit judge deemed alternates were necessary, they each were also given an additional peremptory challenge. *See* Miss. Code Ann. § 13-5-67 (Rev. 2012); URCCC 10.01. But contrary to section 13-5-67 and Rule 10.01, the circuit

4

judge did not keep the peremptory challenges separate. Instead, he lumped each side's twelve peremptory challenges for regular jurors and one peremptory challenge for alternate jurors together—for a total of thirteen challenges. *But see* URCCC 10.01 (prohibiting the twelve peremptory challenges from being "used in the selection of an alternate juror or jurors" and "challenges for alternate jurors [from being] used in the selection of regular jurors").

¶13.   Nor did the judge keep the selection process for regular jurors and alternate jurors separate, as Rule 4.05 directs. *See* URCCC 4.05. After strikes for cause, the venire had forty members. And the judge felt that if each side used all thirteen of their peremptory challenges—twenty-six in total—there would end up being fourteen jurors, enough for the twelve regular jurors and two alternates. He then asked the State to tender to defense counsel a panel of *fourteen* accepted jurors. The State used eight peremptory challenges before tendering fourteen accepted jurors. Defense counsel then used eight peremptory challenges, leading to six jurors being accepted in the first round. The process was repeated, with each side using three more challenges (for a total of eleven each) before coming up with a fourteen-member panel. *But see* URCCC 4.05.[3]

¶14.   These fourteen jurors were sworn in and empaneled without any objection. At the end of closing argument, the circuit judge placed the numbers one through fourteen in a paper

---

[3] Under Rule 4.05, after challenges for cause, the State should have used its original twelve peremptory challenges first to tender a panel of twelve regular jurors. URCCC 4.05(A)(1), (2). The defense then should have been required to use its peremptory challenges on that panel. URCCC 4.05(A)(3). This process should have repeated until a full panel of jurors had been accepted by both sides. URCCC 4.05(A)(5). *Then* the two alternates should have been selected following the same procedure. URCCC 4.05(A)(6).

5

cup. He drew two numbers out—juror six and juror seven—and declared them to be the alternates. *But see* Miss. Code Ann. § 13-5-67; URCCC 4.05. The judge then sent the remaining twelve jurors into the jury room to deliberate.

### B. Evidence

¶15. The jury had heard testimony from the officers involved in the investigation and arrest, as well as Tinner. The State also called Steven Little, a serologist with the Mississippi Crime Lab. Little confirmed Hamp's right shoe and shorts had blood on them. Little also found blood on the victim's clothing. The State next called William Jones, a DNA analyst who served as section chief of the biosciences division of the Mississippi Crime Laboratory. Jones served as the technical reviewer for the DNA analysis performed on the blood samples. Analyst Alexandria Bradley had concluded the blood taken from Hamp's clothes matched the known DNA sample from the victim, Simmons. And after reviewing her work and ensuring the results matched and all proper protocols had been followed, Jones signed off on the report. The report said he agreed with Bradley's conclusion.

### C. Conviction and Sentence

¶16. Based on the evidence, the jury found Carr guilty of capital murder. The judge sentenced him to life imprisonment, without eligibility for parole or other early release. Carr filed a motion for a judgment notwithstanding the verdict or new trial, challenging the weight and sufficiency of the evidence. After this motion was denied, Carr timely appealed.

### Discussion

### I. Testimony about DNA Match

¶17. On appeal, Carr first argues the circuit judge erred by permitting Williams Jones to testify about the DNA report linking the blood on Hamp's clothing to the victim. According to Carr, Jones provided "surrogate testimony" in violation of his Sixth Amendment right to confront his accuser.[4] *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2710 (2011) (applying U.S. Const. amend VI).

¶18. But in contrast to the witness in *Bullcoming*, Jones was no mere surrogate for Bradley. In *Bullcoming*, an aggravated-DUI case, the prosecution built its case upon a lab report certifying Bullcoming's blood-alcohol level was above the legal limit. *Id.* at 2709. But "[a]t trial, the prosecution did not call as a witness the analyst who signed the certification. Instead, the State called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." *Id.* The United States Supreme Court held this violated the Confrontation Clause. Because the lab report certifying Bullcoming's blood-alcohol level was a "testimonial statement" by the analyst who produced the report, it was reversible error for the trial court to introduce this statement "through the in-court testimony of a second person." *Id.* at 2713.

¶19. *Bullcoming*, however, did not address the question before us today: Does the testimony of the technical reviewer—who did not perform the initial DNA analysis but

---

[4] The Sixth Amendment "guarantee[s] a defendant in any criminal prosecution the right to confront and cross-examine the witnesses against him[.]" *Galloway v. State*, 122 So. 3d 614, 636 (¶42) (Miss. 2013) (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26). And "[t]he United States Supreme Court has held that, under the Sixth Amendment Confrontation Clause, testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine the witness." *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).

7

reviewed the initial analyst's work, conducted his own independent analysis, and ultimately signed the report verifying the DNA found on the codefendant matched the victim—satisfy the Confrontation Clause? As Justice Sotomayor noted in her concurrence, *Bullcoming* was "not a case in which the person testifying [wa]s a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 2722 (Sotomayor, J., concurring in part). There, the testifying analyst "conceded on cross-examination that he played no role in producing the [blood-alcohol-level] report and did not observe any portion of . . . the testing." *Id.* And "[i]t would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results." *Id.*

¶20. Here, we are confronted with that different case—where a supervisor, Jones, observed an analyst, Bradley, conducting a DNA test and testified about the results, which he verified before he signed the report. And we conclude that Jones's testimony, in contrast to the analyst in *Bullcoming*, did not violate the Confrontation Clause. In so holding, we are guided by our own supreme court—both its majority and dissenting opinions—when faced with the exact same scenario. *See Galloway v. State*, 122 So. 3d 614 (Miss. 2013).

¶21. In *Galloway*, the Mississippi Supreme Court addressed whether the testimony of DNA analyst Bonnie Dubourg violated the Confrontation Clause in light of *Bullcoming*. *Id.* at 637 (¶¶46-48). Though Dubourg worked in the lab that tested the DNA, it was another analyst, Julie Golden, who actually performed the DNA testing. *Id.* at 636 (¶40). The majority of the supreme court assumed the DNA report was testimonial. *Id.* at (¶42). But the supreme court

8

rejected the defendant's contention that only Golden could testify about the DNA results. "Distinguishable from *Bullcoming*, the record [in *Galloway*] illustrate[d] that Dubourg, as the technical reviewer assigned to the case, was familiar with each step of the complex testing process conducted by Golden, and Dubourg performed her own analysis of the data." *Id.* at 637 (¶48). Moreover, "Dubourg personally analyzed the data generated by each test conducted by Golden and signed the report." *Id.* So "[g]iven Dubourg's knowledge about the underlying testing process and the report itself, any questions regarding the accuracy of the report due to possible contamination of the DNA samples could have been asked of Dubourg." *Id.* at 637-38 (¶48). For these reasons, the supreme court found Dubourg's testimony did not violate the Confrontation Clause. *Id.* at 638 (¶49).

¶22. Like the witness in *Galloway*, Jones, "as the technical reviewer assigned to the case, was familiar with each step of the complex testing process conducted by [Bradley], . . . personally analyzed the data generated by each test conducted by [Bradley,] and signed the report." *Id.* at 637 (¶48). Based on Jones's personal knowledge about the testing process and the resulting DNA report, any questions Carr may have had about the accuracy of the testing or report could have been put to Jones on cross-examination. *See id.* So applying *Galloway*, we too find no Confrontation Clause violation.

¶23. And we acknowledge Justice Kitchens's dissent in *Galloway*, which found no Confrontation Clause violation, but for a different reason—the nontestimonial nature of the underlying DNA testing. *Id*. at 684-85 (¶¶260-62) (Kitchens, J., dissenting). "In the case of DNA testing, the underlying reports of the nontestifying expert, if used only as a premise to

9

support the testifying expert's opinion, may not be testimonial." *Id.* at 684 (¶260) (citing

*Williams v. Illinois*, 132 S. Ct. 2221, 2221 (2012)). Such was the case in *Williams*, where the

DNA test results had not been admitted into evidence. Rather, they had been relied upon by

the testifying expert to determine if the sample from the crime scene and the test sample

matched. *Id.* at 685 (¶260) (citing *Williams*, 132 S. Ct. at 2240). Thus, "[t]he 'testimonial

statement' and the statement that was incriminating of the defendant was that the two profiles

matched, not that the report contained an accurate profile of the defendant's DNA." *Id.* And

because these statements were "not reliant at all upon the validity of the underlying testing

used to generate the DNA profiles," the analyst who performed the tests did not have to

testify in order to satisfy the Confrontation Clause. *Id.*

¶24.    Justice Kitchens deemed Dubourg's testimony in *Galloway* to be "strikingly similar

to that found in *Williams*," because the actual DNA test results had not been admitted into

evidence but instead were the basis for the expert's opinion that the two DNA samples

matched. *Id.* at (¶261). So it was Dubourg—not the nontestifying examiner—who made the

"testimonial statements" that, in her expert opinion, the two DNA profiles matched.

"Golden's test results merely offered a profile, and, as such, were not testimonial statements

under *Williams*." *Id.*

¶25.    As we have already discussed, Jones's testimony is "strikingly similar" to Dubourg's.

Before testifying, Jones was accepted as a DNA expert. And he testified, based on the DNA

profiles generated by Bradley, the samples from Hamp's shoe and the victim matched. Thus,

the incriminating testimonial statement—that the two profiles matched—came from Jones.

For this alternate reason, Jones's testimony did not violate Carr's Sixth Amendment rights.

## II. Jury-Selection Process

¶26. Next, Carr asks for a new trial based on the jury-selection process. Carr asserts the circuit judge abused his discretion by utilizing a "paper cup" to select alternates. But Carr never objected to the jury-selection method or the ultimate composition of the jury at any point before, during, or after trial. Instead, he attacks this process for the first time on appeal. Our supreme court "has continuously held that 'a party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter.'" *Thorson v. State*, 895 So. 2d 85, 118 (¶81) (Miss. 2004) (quoting *Bell v. State*, 725 So. 2d 836, 844 (¶10) (Miss. 1998)). So by not objecting, Carr has waived his right to complain on appeal. *See Burrell v. State*, 2014-KA-0670-SCT, 2015 WL 6388746, at *2-3 (¶¶10-11) (Miss. Oct. 22, 2015) (holding a defendant who waited until the end of trial to argue Judge Webster's irregular jury-selection process violated Rule 4.05 waived this claim).

¶27. Any review of the jury-selection process would have to be under the plain-error doctrine. "The plain-error doctrine provides for appellate review of obvious errors not properly raised by the defendant at trial, which affect a defendant's 'fundamental, substantive rights.'" *Heidelberg v. State*, 45 So. 3d 730, 732 (¶7) (Miss. Ct. App. 2010) (quoting *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008)). "To succeed under the plain-error standard, [Carr] must show (1) an error at the trial level (2) that resulted in a manifest miscarriage of justice." *Id.* (citing *Stephens v. State*, 911 So. 2d 424, 432 (¶19) (Miss. 2005)).

11

¶28. The first question is whether there was an error. Obviously, Mississippi's statutes and rules about jury selection do not provide for waiting until the end of trial to randomly select alternate jurors.[5] *See* Miss. Code Ann. § 13-5-67; URCCC 4.05, 10.01. But "[a]ll the provisions of law in relation to the listing, drawing, summoning and impaneling juries are *directory merely*[.]" Miss. Code Ann. § 13-5-87 (Rev. 2012) (emphasis added). "[A]nd a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn, and it shall have the power to perform all the duties devolving on the jury." *Id.*; *see also Havard v. State*, 986 So. 2d 333, 335 (¶11) (Miss. 2007) ("The jury laws of this state are directory and the selection of the jury in an irregular manner does not render it illegal." (quoting *De La Beckwith v. State*, 707 So. 2d 547, 597-98 (¶199) (Miss. 1997))). So despite being selected in "an irregular manner," the jury here was a legal jury with the authority to render a verdict against Carr.

¶29. But even were we to find the circuit judge erred by not following the directives of section 13-5-67 and Rules 4.05 and 10.01, Carr fails to show how this departure affected his fundamental, substantive rights or otherwise led to a manifest miscarriage of justice. Of course, Carr had a fundamental right to a fair trial by an impartial jury—another guarantee of the Sixth Amendment. *Johnson v. State*, 476 So. 2d 1195, 1209-10 (Miss. 1985) (citing U.S. Const. amend VI; Miss. Const. art. 3, § 26). But Carr has made *no assertion* his Sixth

---

[5] But we do note the American Bar Association actually recommends waiting to determine "[t]he status of jurors as regular jurors or as alternates . . . through random selection at the time for jury deliberation." American Bar Association, *Principles for Juries and Jury Trials*, Principle 11(G)(2).

Amendment right to an impartial jury was violated due to the jury-selection process. Carr does not claim the jury was composed of incompetent jurors. And "[w]here there is no evidence to show that the defendant was not, in fact, tried by a fair and impartial jury, 'error may not be predicated for an irregularity in drawing or impaneling the jury.'" *Havard*, 986 So. 2d at 336 (¶11) (quoting *Davis v. State*, 660 So. 2d 1228, 1261 (Miss. 1995)).

¶30.    What Carr claims instead is that his defense counsel was prejudiced by not being allowed to allocate his peremptory challenges between regular and alternate jurors, as the statute and rules directed. But as the supreme court has held, "[p]eremptory challenges are not of constitutional dimension." *Simmons v. State*, 805 So. 2d 452, 501 (¶137) (Miss. 2001). Instead, "they are a means to achieve the end of an impartial jury." *Id.* In *Simmons*, a capital case, the defendant, Gary Carl Simmons, complained the jury-selection process violated Mississippi Code Annotated section 99-17-3 because his counsel had to expend peremptory challenges on jurors who had not first been tendered to the State. *Simmons*, 805 So. 2d at 500-01 (¶¶135-36). But like Carr, Simmons did not object at trial. *Id.* at (¶136). Though acknowledging failure to abide by section 99-17-3 is a reversible error, the supreme court found no reason to reverse. Instead, the supreme court held, "so long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Simmons*, 805 So. 2d at 501 (¶137).

¶31.    Applying *Simmons* here, we find so long as the jury that sat was impartial, the fact that Carr had to pool his regular and alternate peremptory challenges to achieve that result does not mean his Sixth Amendment rights were violated. Carr makes no claim that any of the

13

twelve jury members who went to the jury room to deliberate were partial. So we find the misallocation of his peremptory challenges did not affect a fundamental, substantive right. *See id.; see also Fleming v. State*, 732 So. 2d 172, 180-82 (¶¶27-32) (Miss. 1999) (holding it was harmless error to force the defense to expend a peremptory challenge on a juror who should have been stricken for cause).

¶32. Carr also argues his counsel was prejudiced by not knowing who the twelve regular jurors were and who the two alternates were during trial. Carr claims this uncertainty affected his counsel's defense strategy. But Carr's counsel never requested the regular jurors be distinguished from the alternate jurors before trial began. As defense counsel never objected, we fail to see how his defense strategy was affected.[6]

¶33. Because Carr has failed to show "that any deficiency in jury selection resulted in prejudice to his case," *Havard*, 986 So. 2d at 335 (¶11), we find no reversible error in the jury-selection process—especially since Carr waived his right to raise this issue on appeal by not objecting. *See Burrell*, 2015 WL 6388746, at *3 (¶11).

¶34. **THE JUDGMENT OF THE COAHOMA COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT ELIGIBILITY FOR PAROLE OR ANY OTHER TYPE OF EARLY RELEASE, TO RUN CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO COAHOMA COUNTY.**

---

[6] Every trial in which alternates are selected carries the possibility that one or all of the alternates will end up serving. This is why "[a]lternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges for cause, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors." Miss. Code Ann. § 13-5-67.

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, JAMES AND WILSON, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT.**