# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00035-COA

**WILLIAM MACK, JR.**                                                  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/27/2015 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SETH MAGILL HUNTER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA MCCLINTON |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF AGGRAVATED ASSAULT AND SENTENCED TO TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH SEVENTEEN YEARS TO SERVE, THREE YEARS SUSPENDED, AND THREE YEARS OF POSTRELEASE SUPERVISION, AND TO PAY A FINE OF $2,500 AND AN ASSESSMENT OF $100 TO THE MISSISSIPPI CRIME VICTIMS' COMPENSATION PROGRAM |
| DISPOSITION: | AFFIRMED - 06/06/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE GRIFFIS, P.J., CARLTON AND GREENLEE, JJ.

### CARLTON, J., FOR THE COURT:

¶1.  A Forrest County jury found William Mack Jr. (Mack) guilty of aggravated assault.

*See* Miss. Code Ann. § 97-3-7(2)(b) (Rev. 2006).  On appeal, Mack asserts the following

issues: (1) the circuit court was not impartial in dismissing members of the venire; (2) insufficient probable cause existed to issue his arrest warrant; (3) the State elicited testimony that violated his right against self-incrimination; (4) the circuit court improperly instructed the jury; (5) the circuit court erred by denying his motion for a judgment notwithstanding the verdict (JNOV); and (6) the jury's verdict was against the overwhelming weight of the evidence.

¶2.    Finding no error, we affirm Mack's conviction and sentence.

**FACTS**

¶3.    On September 20, 2013, a grand jury indicted both Mack and his father, William Mack Sr. (Mack Sr.), for the aggravated assault of Joseph Scott (Scott). The circuit court subsequently granted Mack's motion to sever his trial from his father's trial.

¶4.    At Mack's trial, Scott testified that he was standing outside his grandparents' house in Hattiesburg, Mississippi, on January 25, 2013, when Mack shot him. Scott testified that he had known Mack since they were both young and that he had considered Mack to be like a younger brother. The day before the shooting, Scott testified that Mack Sr.'s brother, Steve Mack, accused him of stealing candy from a store Steve operated out of his house. Scott testified that, even though Steve threw a brick at him and then threw a can of paint on him during the argument, he did not fight with Steve.

¶5.    The morning after the altercation with Steve, Scott testified that he was walking at a park with his girlfriend when he received news that Steve also had an argument with his

2

friend, Warren Randle. Upon returning to his grandparents' home, Scott testified that Mack Sr. drove up and got out of a vehicle holding a baseball bat in his left hand and a gun in his right hand. Scott stated that Mack Sr. swung the bat at him but that he (Scott) managed to grab the bat. Scott further stated that Mack Sr. then got back into his vehicle and drove away. However, Scott testified that Mack Sr. returned a few minutes later and that Mack exited the vehicle holding a gun. Scott claimed that Mack fired several shots at him, hitting Scott in both the arm and the leg and hitting Scott's truck several times. Scott stated that he immediately drove his truck to the police station to report the crime and to seek medical attention.

¶6. Officer Demetrius Breland with the Hattiesburg Police Department testified that he was on patrol duty the morning of the shooting. While parked at an intersection, Officer Breland observed a black male in a gray Jeep drive by at a high rate of speed. Officer Breland also noticed that the vehicle had a flat tire, and he attempted to follow the Jeep to see what was wrong. After patrolling several streets, Officer Breland found the Jeep parked in front of a nearby residence. However, the Jeep was unoccupied, and Officer Breland saw no one standing near the Jeep. Officer Breland testified that he continued his patrol but returned to the residence a short time later after receiving a dispatch about a gray Jeep involved in a shooting. Officer Breland stated that the Jeep was no longer parked at the residence by the time he returned. After spending a few more minutes trying to relocate the Jeep, Officer Breland testified that he drove to the police station to take Scott's statement.

3

Upon arriving at the police station, Officer Breland observed Scott's white truck with the windows shattered. He further testified that medical personnel had arrived and were treating Scott's injuries.

¶7. Randle testified that he lived down the street from Scott's grandparents and that he was home when the shooting occurred. Randle further testified that he was well acquainted with both Mack and Scott. The night before the shooting, Randle stated that he witnessed an altercation between Scott and Mack Sr.'s brother, Steve. Although Randle testified that the altercation was only verbal, he did state that Steve threw paint at Scott. Following the altercation between Scott and Steve, Randle testified that he went to work around 9 p.m. and then got off work the following morning at 6 a.m.

¶8. On the day of the shooting, Randle stated that he saw Mack Sr. driving around the neighborhood with Mack in the passenger seat. About four to six minutes later, Randle claimed he heard the squeal of tires and saw Scott's truck being driven in reverse with the Macks' vehicle in pursuit. Randle testified that he subsequently learned Scott had been shot. According to Randle, however, he already knew what was about to happen when he saw Mack Sr. and Mack driving by because news had spread around the neighborhood that the Macks were out to get Scott.

¶9. Jeff Byrd, who collected evidence from the crime scene, testified that he found several .45-caliber shell casings in the middle of the road in front of Scott's grandparents' house. Byrd further testified, however, that he found no physical evidence to directly link Mack to

4

the shooting. Byrd also stated that, to his knowledge, law enforcement never found the weapon used in the shooting.

¶10. The jury also heard testimony from Detective Joel Scott (Detective Scott), who investigated the shooting. During the course of his investigation, Detective Scott learned that Mack's grandmother, Evelyn Mack, owned the Jeep identified as the vehicle driven by the shooters. Detective Scott stated that law enforcement issued arrest warrants in the case and arrested Mack Sr. within one or two days of the shooting. However, Detective Scott said that law enforcement was unable to locate Mack until about two weeks later, when they apprehended him in DeKalb County, Georgia, on February 8, 2013.

¶11. Although Randle denied during his testimony that he ever spoke to law enforcement about the shooting, Detective Scott stated that he briefly spoke to Randle. According to Detective Scott, Randle said he knew what caused both the altercation and the shooting. Furthermore, Detective Scott testified that Randle reported seeing Mack Sr. and Mack in the Jeep prior to the shooting. Detective Scott also stated that Randle claimed Mack Sr. was driving the Jeep and that Mack, who was hanging out of the Jeep, said to Randle, "I'm going to get you next." In addition, Detective Scott testified that, shortly after seeing the Macks drive by, Randle heard gunshots.

¶12. At a later point in his testimony, however, Detective Scott clarified that he never actually obtained a statement from Randle or physically interviewed Randle. Instead, Detective Scott explained that, in the underlying facts and circumstances used to obtain the

5

arrest warrants for the shooting, he summarized everything he had heard about the case, which included statements attributed to Randle.

¶13.    After the State rested its case-in-chief, Mack testified on his own behalf. Mack disputed Scott's version of events, and he denied shooting Scott. In fact, according to Mack, he was out of town on the day of the shooting. Mack testified that, the day before the shooting, he heard about an altercation his uncle, Steve, had with Scott. That same evening, Mack testified that he rode his bike to visit his grandmother, who lived next to Scott's grandparents. As he left his grandmother's house around 11 p.m., Mack testified that he saw Scott and Randle's older brother, Larry Randle, standing beside a car. Mack stated that Larry grabbed a handgun and threatened him as he (Mack) rode by the car. As he was riding home, Mack testified that he noticed the same vehicle following him. As a result, Mack testified that he got off his bike, hid from the men, and then fled on foot to his father's house. After telling his father what happened, Mack testified that he asked a friend to drive him to Jackson, Mississippi. Once in Jackson, Mack testified that he bought a bus ticket to Atlanta, Georgia, so that he could stay with his mother and stepfather.

¶14.    On cross-examination, Mack admitted that he never gave a statement to law enforcement about leaving town the night prior to Scott's shooting. Mack also confirmed that neither his friend who drove him to Jackson nor any of his family from Georgia or Mississippi were present at the trial to confirm his alibi. Upon further cross-examination by the State, Mack stated that he did not want to get his friend involved in the trial. Mack also

6

stated that all his family in Georgia were unable to drive to Mississippi for his trial due to illness, work, or other reasons.

¶15. After considering the evidence and testimony, the jury found Mack guilty of aggravated assault against Scott. The circuit court sentenced Mack to twenty years in the custody of the Mississippi Department of Corrections, with seventeen years to serve, three years suspended, and three years of postrelease supervision; to pay a $2,500 fine; and to pay a $100 assessment to the Mississippi Crime Victims' Compensation Program. Mack subsequently filed both an original and supplemental motion for a JNOV or, in the alternative, a new trial. Aggrieved by the circuit court's denial of both motions, Mack appeals.

## DISCUSSION

I. **Whether the circuit court was partial in dismissing members of the venire.**

¶16. Mack asserts that the circuit court failed to impartially dismiss members of the venire. He further contends that this partial jury-selection process denied him a fair trial and resulted in a jury that was biased against him from the outset.

¶17. "Our supreme court has continuously held that a party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter." *Carr v. State*, 190 So. 3d 1, 7 (¶26) (Miss. Ct. App. 2015). As the record reflects, Mack never raised an objection before the circuit court as to the jury-selection process or the ultimate composition of the jury. He therefore waived his right to complain on appeal. *See id.* As a result, any

review of this issue must be conducted under the plain-error doctrine. *See id.* at (¶¶26-27). Under the plain-error doctrine, we may review obvious errors that affect the defendant's fundamental, substantive rights even though the defendant failed to properly raise the errors at trial. *Id.* To establish plain error, Mack must demonstrate "(1) an error at the trial level (2) that resulted in a manifest miscarriage of justice." *Id.* at (¶27).

¶18. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." *Batiste v. State*, 184 So. 3d 290, 291 (¶3) (Miss. 2016) (quoting U.S. Const. amend. VI). *See also* Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have a right to . . . a speedy and public trial by an impartial jury of the county where the offense was committed . . . ."). "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and the state constitutions." *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985) (citing *Adams v. State*, 220 Miss. 812, 815-16, 72 So. 2d 211, 213 (1954)).

¶19. In applying the plain-error doctrine to Mack's argument, we acknowledge the following:

> In general, voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome the presumption, a party must present evidence indicating that the jury was not fair and was partial and must show that that prejudice resulted from the circuit court's handling of voir dire. Voir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to [the court's] sound discretion.

*Keller v. State*, 138 So. 3d 817, 843 (¶47) (Miss. 2014) (internal citations and quotation marks omitted). We further recognize that "[t]he linchpin is whether the venire members

8

stated that they could be fair and impartial jurors if chosen." *Hughes v. State*, 983 So. 2d 270, 284 (¶63) (Miss. 2008) (quoting *Howell v. State*, 860 So. 2d 704, 720 (¶37) (Miss. 2003)).

¶20. Mack first argues that the circuit court erred by sua sponte removing Juror 26 from the venire. During voir dire, Juror 26 stated that she knew both Mack and Scott because she lived in the same neighborhood as them. In response to Juror 26's disclosure, the circuit court judge said, "I'm going to go ahead and let you go, ma'am. Okay. There's no reason for you to stay around. Okay. Thank you though." As previously noted, the defense raised no objection to the circuit court's dismissal of Juror 26. Later, outside the presence of the venire, the circuit court stated, "It should be noted that Juror [26] was excused by agreement of the parties and the fact that she lived in the [same] neighborhood [as] and knew both the defendant and the victim." The record again reflects that the defense asserted no objection to the circuit court's statement regarding Juror 26's dismissal.

¶21. Mack also claims error regarding Jurors 19, 20, 21, and 28, who each indicated they knew potential witnesses for the State. Juror 20 stated that he was a casual acquaintance of Byrd, who collected evidence from the crime scene. Juror 19 stated that, years before, he had worked with Detective Scott, who investigated the shooting. Juror 21 also indicated that she was casually acquainted with Detective Scott, and Juror 28 stated that Detective Scott had attended the same high school as her children. Upon further questioning by the court, however, each of the four jurors stated that nothing about their relationships with the

9

potential witnesses would affect their ability to be fair and impartial jurors in Mack's case.

¶22.    Next, Mack claims error with regard to Jurors 15, 19, 23, and 28, who all indicated that either they or someone close to them had been the victim of an aggravated assault. Mack also assigns error to the circuit court's failure to dismiss Jurors 7, 20, 21, 25, 29, and 32, who all previously served on a jury that found a criminal defendant guilty. As the record reflects, however, Mack failed to raise an objection to these jurors remaining on the venire. Furthermore, all of the jurors informed the circuit court that their past experiences would not impact their ability to remain fair and impartial.

¶23.    Upon review, we find that Mack not only waived his objections with regard to these jurors but also fails to present evidence to demonstrate plain error. As discussed, the undisputed record evidence establishes that Mack did not object either to the dismissal of Juror 26 or to the circuit court's statement that the parties agreed to her dismissal. As to his other arguments related to the makeup of the venire, Mack never objected to the potential jurors who remained on the venire. In addition, each potential juror affirmed that he or she could remain fair and impartial if selected for Mack's trial. We therefore find that Mack fails to meet his burden to demonstrate that a manifest miscarriage of justice occurred. *See Carr*, 190 So. 3d at 7 (¶26). This assignment of error lacks merit.

**II.     Whether sufficient probable cause existed to issue Mack's arrest warrant.**

¶24.    For the first time on appeal, Mack challenges the validity of his arrest warrant. Mack alleges that Detective Scott's affidavit contained fraudulent information and that, without the

10

fraudulent information, insufficient cause existed to issue his arrest warrant. Because Mack

failed to raise this argument before the circuit court, he now asserts the issue under the plain-

error doctrine. *See Conerly v. State*, 760 So. 2d 737, 739-40 (¶5) (Miss. 2000).

¶25.   In *Conerly*, the Mississippi Supreme Court stated:

> To obtain an arrest warrant for a felony, either with or without a warrant, a police officer must have (1) reasonable cause to believe that a felony has been committed; and (2) reasonable cause to believe that the person proposed to be arrested is the one who committed [the felony]. Arrest warrants or search warrants shall be issued only by the judge after a judicial determination that probable cause exists based upon the affidavit or other evidence before the court. Furthermore, in *Illinois v. Gates*, 462 U.S. 213 (1983), the United States Supreme Court established a totality[-]of[-]the[-]circumstances standard for determining the existence of probable cause: The task of the issuing magistrate is simply to make a practical, common-sense decision based on all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information. [Mississippi] adopted the *Gates* totality[-]of[-]the[-]circumstances test in *Lee v. State*, 435 So. 2d 674, 676 (Miss. 1983).

> Moreover, this Court has defined probable cause as follows:

> Probable cause is a practical, non-technical concept, based upon the conventional considerations of every day life on which reasonable and prudent men, not legal technicians, act. It arises when the facts and circumstances within an officer's knowledge, or of which he has reasonably trustworthy information, are sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.

> Perhaps more simply put, probable cause means more than a bare suspicion but less than evidence that would justify condemnation.

*Conerly*, 760 So. 2d at 740-41 (¶¶7-8) (internal citations and quotation marks omitted).

¶26.   In the present case, Mack relies on *Conerly* to argue that Detective Scott's affidavit

11

failed to establish sufficient probable cause for the issuance of his arrest warrant. Like Mack, the defendant in *Conerly* first challenged the validity of his arrest warrant on appeal. *Id.* at 740 (¶5). The issuance of Conerly's arrest warrant was based solely on an affidavit that, in pertinent part, stated:

> On September 23, 1997, Dornis Lenoir[] came home and discovered that [a] diamond ring and a car radio amplifier were missing from her residence . . . . The house was locked[,] and the house was entered into from a window. [**Lenoir**] **was advised by some neighbors down the road that the person who was responsible for the missing items was Ricky Conerly.**

*Id.* at (¶6) (emphasis added).

¶27.    In his reply brief on appeal, Conerly argued the only basis for the issuance of his arrest warrant was Lenoir's affidavit, which was uncorroborated and contained "nothing but 'raw hearsay.'" *Id.* at 740 (¶¶5-6). Although acknowledging "that an arrest warrant may be based on hearsay[,]" the *Conerly* court explained that "[t]here must be underlying facts and circumstances [that] support the hearsay so as to allow a neutral and detached magistrate to find the existence of probable cause." *Id.* at (¶6) (citing *Walker v. State*, 192 So. 2d 270, 273 (Miss. 1966)). The *Conerly* court further stated that "[u]ncorroborated and unsubstantiated hearsay will simply not suffice." *Id.*

¶28.    After reviewing the appellate record in *Conerly*, the supreme court found that Lenoir's affidavit failed to indicate that her neighbors witnessed the burglary, and the affidavit provided no factual data to support the neighbors' suspicions of the defendant. *Id.* As a result, the supreme court concluded that the affidavit contained nothing more than

12

uncorroborated rumors and that, standing alone, the affidavit failed to establish sufficient probable cause to support the issuance of Conerly's arrest warrant. *Id.* at 740-41 (¶¶6, 8).

¶29. In the present case, Detective Scott's affidavit served as the basis for the issuance of Mack's arrest warrant. Detective Scott's affidavit stated that officers spoke to Scott, the shooting victim, who identified the Macks as his assailants. The affidavit also stated that "Detective Scott spoke with . . . Randle." At trial, however, Randle denied that he ever spoke to a law-enforcement officer. Furthermore, Detective Scott stated at one point during his testimony that he never physically interviewed Randle and that Randle never gave a statement to police. Instead, Detective Scott explained that his affidavit was a summary of everything everyone had heard about the shooting.

¶30. As the record reflects, Detective Scott's affidavit was never actually admitted into evidence during Mack's trial. The defense used the contents of the affidavit to cross-examine Detective Scott and to attempt to impeach the State's witnesses. Then, following the conclusion of Detective Scott's testimony, the defense moved to admit the affidavit for identification purposes only, which the circuit court allowed.

¶31. As previously discussed, Mack argues on appeal that Detective Scott's affidavit contains statements incorrectly attributed to Randle. Without these statements, Mack contends the affidavit, like the one in *Conerly*, fails to establish probable cause. *See Busick v. State*, 906 So. 2d 846, 854 (¶10) (Miss. Ct. App. 2005) ("If the remaining content provides insufficient support for a finding of probable cause, the arrest warrant must be voided and

13

the fruits of the arrest excluded to the same extent as if probable cause was lacking on the face of the affidavit.").

¶32. In *Conerly*, the supreme court found that the victim's affidavit contained nothing but hearsay and rumors from neighbors who apparently neither witnessed the burglary nor provided factual support for their suspicions. *Conerly*, 760 So. 2d at 740 (¶6). By contrast, even without the statements attributed to Randle, Detective Scott's affidavit contained factual information from Scott, who described his altercation with the Macks and positively identified Mack as his shooter. Although Mack contends that Scott's statements were unsubstantiated and uncorroborated, the supreme court explained in *Conerly* that even hearsay may support the issuance of an arrest warrant as long as the "underlying facts and circumstances . . . support the hearsay so as to allow a neutral and detached magistrate to find the existence of probable cause." *Id.* (citing *Walker*, 192 So. 2d at 273).

¶33. Reviewing Mack's argument on appeal, we find he waived extradition and raised no challenge before the circuit court as to the validity of his arrest warrant. We therefore conclude this issue is procedurally barred. *See id.* at (¶5). Even under plain-error review, we find that Mack's argument fails since Detective Scott's affidavit contained firsthand information supplied by Scott, the victim, who positively identified Mack as his shooter. *Compare id.* at 740-41 (¶¶6-8). Accordingly, this assignment of error lacks merit.

### III. Whether the State elicited testimony that violated Mack's right against self-incrimination.

¶34. Mack next asserts that the State improperly cross-examined him about whether he

gave a pretrial statement to police. According to Mack, the State's questioning violated his right against self-incrimination and prejudiced the jury against him. Mack further argues that the circuit court erred by not immediately declaring a mistrial.

¶35. We review the trial court's decision to grant or deny a mistrial for abuse of discretion. *Crutcher v. State*, 68 So. 3d 724, 727-28 (¶5) (Miss. Ct. App. 2011). "The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Id.* at 728 (¶5). "We have stated that mistrials should only be declared sua sponte under our 'manifest necessity' rule." *Younger v. State*, 931 So. 2d 1289, 1291 (¶7) (Miss. 2006) (citing *Spann v. State*, 557 So. 2d 530, 532 (Miss. 1990)). "In determining whether a mistrial is warranted, the trial court possesses considerable discretion since the trial judge is in the best position to measure the prejudicial effect." *Crutcher*, 68 So. 3d at 728 (¶5).

¶36. Both the federal and state constitutions provide a privilege against self-incrimination for witnesses in criminal proceedings. *Harrell v. Duncan*, 593 So. 2d 1, 5 (Miss. 1991). "In a criminal prosecution[,] the privilege provides that an individual may not be required to take the witness stand at all." *Id.* (quoting *In re Knapp*, 536 So. 2d 1330, 1334 (Miss. 1988)). However, a witness may waive the privilege against self-incrimination if he voluntarily and knowingly "takes the stand and testifies as to the merits of the case." *Id.* Upon so doing, the witness "cannot then, on cross-examination, attempt to avoid further questions on the merits of the case by use of the privilege." *Id.* *See also Autry v. State*, 230 Miss. 421, 436, 92 So.

15

2d 856, 862 (1957) ("Under this rule the accused[,] by taking the witness stand in his own behalf[,] waives the constitutional guaranty against compulsory self-incrimination not only as to matters about which he has given testimony in chief, but also concerning any matter pertinent to the issue on trial regardless of the extent of the direct examination, and [he] cannot then refuse to testify to any fact which would be competent evidence in the case if proved by any other witness." (citation omitted)).

¶37.    In the present case, the circuit court advised Mack of his constitutional rights prior to the defense's presentation of its case-in-chief.  Mack informed the circuit court that he understood his rights and that he wished to testify on his own behalf.  During direct examination, Mack testified that he possessed an alibi for the time of Scott's shooting because he was out of town.  According to Mack's testimony, he traveled to Jackson by bus the night before the shooting and then took another bus to Atlanta.

¶38.    The State subsequently cross-examined Mack about his alibi, and the following exchange occurred:

| State's Attorney: | This story that you just said that [you weren't] in town [at the time of Scott's shooting], did you ever tell police this? |
|---|---|
| Mack: | Oh, yes, sir, yes, sir.  [Detective] Scott to be exact. |
| State's Attorney: | So wait a minute.  [Be]cause my file said you refused to give a statement. |
| Mack: | [Detective Scott] probably did it off the record.  But on a personal level, me and Detective [Scott,] we rode six hours from Atlanta, Georgia, in a car by ourselves. |

16

| | |
|---|---|
| State's Attorney: | Did you[] refuse to give a statement? |
| Mack: | Yes, sir, I did. |
| State's Attorney: | All right. Let's talk for a second. That's important because what you just testified to that you have an alibi [and] that you [weren't] in town that day. Let's go over that because an alibi requires certain things[,] doesn't it? Let's see. First, you say you took a bus out of town. |

The State then continued to question Mack about his alibi and why no one was present at his trial to verify his story. The exchange concluded as follows:

| | |
|---|---|
| State's Attorney: | All these witnesses and all this stuff [where] you say you were somewhere else[,] that's easy to verify. It's very easy to verify your story if it's true? |
| Mack: | Right. |
| State's Attorney: | Right? |
| Mack's Attorney: | Objection, Your Honor. Object to this whole line of questioning because [the State is] commenting on his right to remain silent. |
| State's Attorney: | No, we're talking about now at trial. |
| The Court: | He's already testified so that's no longer a right. |

¶39. Upon review, we find no abuse of discretion from the circuit court's refusal to sua sponte declare a mistrial. *See Crutcher*, 68 So. 3d at 727-28 (¶5). As discussed, after the circuit court advised Mack of his constitutional rights, Mack testified on his own behalf. In so doing, Mack waived his privilege against self-incrimination since he voluntarily and knowingly chose to take the stand and testify. *See Harrell*, 593 So. 2d at 5. In addition, we

agree with the State's argument that the disputed line of questioning pursued during Mack's cross-examination was a comment on Mack's lack of a defense (or his assertion of a new defense at trial) rather than an impermissible comment on his right against self-incrimination. *See Crutcher*, 68 So. 3d at 728 (¶6). Furthermore, as the State asserts in its appellate brief, the line of questioning at issue "was clearly not a comment upon Mack's failure to take the stand [since] Mack was testifying." Thus, we find no merit to Mack's claims that the State's questioning violated his right against self-incrimination or that the circuit court erred by not declaring a mistrial.

## IV. Whether the circuit court improperly instructed the jury.

¶40. Mack next contends that the circuit court improperly instructed the jury by: (1) granting the State's proposed jury instruction S-1 and refusing the defense's proposed jury instruction D-1; (2) granting the State's proposed jury instruction S-4; and (3) granting the State's proposed jury instruction S-5.

¶41. We review the circuit court's grant or refusal of proposed jury instructions for an abuse of discretion. *Quinn v. State*, 191 So. 3d 1227, 1231-32 (¶18) (Miss. 2016). Although "[a] defendant is entitled to have jury instructions given which present his theory of the case[,] this entitlement is limited in that the court may refuse an instruction [that] incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* at 1232 (¶18). We review the jury instructions as a whole and will find no reversible error if the instructions fairly announce the law of the case and create no injustice.

18

*Id.*

### a.    Proposed Jury Instructions S-1 and D-1

¶42.    Mack first asserts that the circuit court abused its discretion by granting proposed jury instruction S-1 in lieu of proposed jury instruction D-1.  The State's proposed instruction S-1 stated:

> The [c]ourt instructs the [j]ury that [Mack] has been charged with the crime of [a]ggravated [a]ssault.  If you find from the evidence beyond a reasonable doubt that:
>
> 1.    [Mack], on or about January 25, 2013, in Forrest County, Mississippi;
>
> 2.    [K]nowingly caused bodily injury to . . . Scott with a deadly weapon, to wit:  [a] gun, by shooting . . . Scott with a gun; and
>
> 3.    [T]hat such behavior was not done in necessary self[-]defense, accident, or misfortune;
>
> then you shall find [Mack] guilty of [a]ggravated [a]ssault.  If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find [Mack] not guilty of [a]ggravated [a]ssault.

¶43.    By contrast, the defense's proposed instruction D-1 stated:

> [Mack] has been charged by way of indictment with unlawfully, feloniously, willfully[,] and knowingly causing serious bodily injury to . . . Scott[] with a deadly weapon[] by striking him and shooting him[.]  You must find . . . Mack not guilty unless the [S]tate proves beyond a reasonable doubt that he:
>
> (1)    [A]ttempt[ed] to cause or purposely or knowingly cause[d]

19

      (2)     [B]odily injury to . . . Scott

      (3)     [W]ith a deadly weapon or other means likely to produce
                death or serious bodily harm.

¶44.    During the jury-instruction conference, the defense objected to proposed instruction S-1, arguing that the proposed instruction followed the language of Mack's indictment rather than section 97-3-7(2)(b). The defense requested that the circuit court refuse the State's proposed instruction and instead grant the defense's proposed instruction D-1, which the defense asserted followed the statute. Although the State agreed that proposed instruction D-1 mirrored the relevant statutory section on aggravated assault, it argued that, unlike the State's own proposed jury instruction, the defense's proposed instruction lacked the facts relevant to Mack's case. The State also contended that, if the court granted instruction S-1, then proposed instruction D-1 would be repetitive. After considering the parties' arguments, the circuit court found that the State's proposed instruction S-1 constituted a proper statement of the law. As a result, the circuit court granted S-1 and refused D-1.

¶45.    On appeal, Mack reasserts his objection that instruction S-1 deviated from the language of section 97-3-7(2)(b). Mack contends that instruction S-1 improperly added that the type of deadly weapon used in the case was "a gun." According to Mack, no evidence connected him to the use of a gun except Scott's testimony, which Mack characterizes as "suspect." As a result, Mack argues that the circuit court abused its discretion by granting instruction S-1 and refusing instruction D-1.

¶46.    In *Boyd v. State*, 47 So. 3d 121, 123 (¶9) (Miss. 2010), the supreme court addressed

the defendant's argument "that the trial court erred in failing to instruct the jury that, in an aggravated-assault prosecution, [the jury] must find that the instrument used by the defendant was a deadly weapon." Although the contested jury instruction provided that the defendant had used "a knife" to injure the victim, the instruction omitted that the knife was "a deadly weapon." *Id.* at 124 (¶12).

¶47. In discussing the defendant's argument, the supreme court found no error with the instruction's identification of the weapon used as "a knife." *Id.* at 124-25 (¶¶13-14).[1] Instead, the supreme court focused on the omission of the phrase "with a deadly weapon or other means likely to produce death or serious bodily harm[,]" which the supreme court explained was "an essential element of the [aggravated-assault] statute." *Id.* at 124 (¶13). The supreme court also acknowledged that Mississippi precedent does not "require[] that an instruction mirror the exact language of a criminal statute" but rather that the jury "be correctly and fully instructed regarding each element of the offense charged." *Id.* at 124-25 (¶13).

¶48. Upon review, we find no abuse of discretion in the circuit court's grant of proposed instruction S-1 and its refusal of proposed instruction D-1. Scott testified that Mack shot him

---

[1] *See also Jackson v. State*, 70 So. 3d 1137, 1139 (¶10) (Miss. Ct. App. 2011) (aggravated-assault jury instruction provided that the defendant caused bodily injury to the victim by shooting him "with a deadly weapon, to-wit: a gun"); *McKinley v. State*, 873 So. 2d 1052, 1053-54 (¶8) (Miss. Ct. App. 2004) (aggravated-assault jury instruction provided that the defendant caused bodily injury to his victims "with a deadly weapon, to-wit: a pistol").

with a gun. Although Mack disputes Scott's testimony, the credibility and weight given to Scott's testimony were matters for the jury to decide. *See Roop v. S. Pharm. Corp.*, 188 So. 3d 1179, 1186 (¶23) (Miss. 2016). A review of the record and relevant caselaw reflects that instruction S-1 provided the essential elements of aggravated assault and possessed a foundation in the evidence presented at Mack's trial. As a result, the circuit court properly granted S-1 as a correct statement of law. Furthermore, the circuit court properly refused instruction D-1 since it was fairly covered by instruction S-1 and would have been repetitive. *See Donelson v. State*, 158 So. 3d 1154, 1165 (¶56) (Miss. Ct. App. 2014). Accordingly, we find this assignment of error lacks merit.

### b.     Proposed Jury Instruction S-4

¶49.    Mack next argues that the circuit court abused its discretion by granting the State's proposed jury instruction S-4, which stated:

> The [c]ourt instructs the [j]ury that it is a question of fact for you to determine whether the gun claimed to have been used by the Defendant was a deadly weapon in the manner it was used in this case.

> A deadly weapon may be defined as any object, article, or means which, when used as a weapon[,] is, under the existing circumstances, reasonably capable or likely to produce death or serious bodily harm to a human being upon whom the object, article, or means is used as a weapon.

On appeal, Mack reasserts his trial argument that instruction S-4 was both repetitive and unnecessary since the circuit court granted instruction S-1. According to Mack, the jury did not need a second instruction to explain to them the meaning of "a deadly weapon."

¶50.    In *Williams v. State*, 134 So. 3d 732, 733 (¶1) (Miss. 2014), the defendant appealed

22

his armed-robbery conviction and asserted, among other issues, that the trial court erred by failing to instruct the jury on the legal definition of a deadly weapon. The instruction that Williams argued should have been granted was almost identical to the one Mack now complains of in the present case. *See id.* at 737 (¶18). In addressing Williams's argument that the trial court should have instructed the jury on the legal definition of a deadly weapon, the supreme court acknowledged that it had upheld such an instruction in previous cases and that such an "instruction better informs the jury that the question as to whether a particular instrument constitutes a deadly weapon lies with the jury." *Id.* at (¶¶18-19). Because Mississippi precedent clearly demonstrates that the supreme court has repeatedly upheld the grant of instructions that legally define a deadly weapon, we find no abuse of discretion by the circuit court's grant of proposed jury instruction S-4. As a result, we find Mack's argument lacks merit.

### c.     Proposed Jury Instruction S-5

¶51.    Mack also claims that the circuit court abused its discretion by granting the State's proposed jury instruction S-5, which provided:

> A person charged with aggravated assault does not have to possess ill-will toward his victim(s). A person charged with aggravated assault does not even have to know the identity of a specific individual to commit an aggravated assault upon that person.

> In this trial this [r]ule of [l]aw means that [Mack] did not have to possess ill-will toward . . . Scott. It also means that [Mack] did not even have to know or recognize . . . Scott . . . to commit an aggravated assault upon him.

¶52.    At the jury-instruction conference, the defense objected to instruction S-5 as an

23

improper reference to Mack's state of mind. According to Mack's attorney, the instruction lacked a foundation in the evidence because no testimony had been presented as to Mack's state of mind and whether he possessed an ill will toward Scott. On appeal, Mack further asserts that instruction S-5 was unnecessary and repetitious and served to bias the jury against him.

¶53. We find no abuse of discretion by the circuit court's grant of proposed instruction S-5. In *Blanks v. State*, 542 So. 2d 222, 226 (Miss. 1989), the supreme court rejected the defendant's argument that ignorance of the assault victim's identity prevented the defendant from forming the intent necessary to commit the crime. The supreme court found that, even in the defendant's version of events, he clearly knew he was shooting at another human being. *Id.* According to the *Blanks* court, a person "does not have to possess ill-will toward or even know the identity of a specific individual to commit an aggravated assault on that person." *Id.* (citing *Davis v. State*, 476 So. 2d 608, 610 (Miss. 1985)). Based on Mississippi precedent, as well as the facts in the record of this case, we find jury instruction S-5 was a correct statement of the law. We therefore find this argument lacks merit.

**V.     Whether the circuit court erred by denying Mack's motion for a JNOV.**

¶54. Mack also claims the circuit court erred by denying his motion for a JNOV. A motion for a JNOV challenges the legal sufficiency of the evidence, and this Court reviews the trial court's denial of such a motion de novo. *See Kirk v. State*, 160 So. 3d 685, 695 (¶24) (Miss. 2015).

24

¶55.    In *Kirk*, the supreme court explained:

> In considering the legal sufficiency of the evidence, [appellate courts] will affirm the denial of a motion for [a] JNOV if there is substantial evidence to support the verdict. Substantial evidence is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions. [The appellate court] considers whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test[,] it is insufficient to support a conviction. This Court has held:
>
> > Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render.
>
> However,
>
> > if a review of the evidence reveals that it is of such quality and weight that, having in mind the beyond[-]a[-]reasonable[-]doubt [-]burden[-]of[-]proof standard, reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient.
>
> The evidence is viewed in the light most favorable to the verdict.

*Id.* at 695-96 (¶25) (internal citations and quotation marks omitted).

¶56.    At Mack's trial, the State presented evidence to show that Mack shot Scott on January 25, 2013, in Forrest County. Scott positively identified Mack as his shooter and testified that he knew Mack well. The jury also heard Randle testify that he witnessed the Macks driving around the neighborhood and then saw them pursuing Scott in their vehicle. In addition,

25

Randle testified that word had spread around the neighborhood that the Macks were after Scott. Officer Breland also testified that, upon arriving at the police station after the shooting, he saw Scott receiving medical attention for his wounds and observed the shattered windows of Scott's truck. Further trial testimony reflected that police recovered several shell casings from the street in front of Scott's grandparents' home. Although Mack disputes on appeal the credibility of Scott's testimony, as previously discussed, the weight and credibility of witness testimony are questions for the jury to determine. *See Roop*, 188 So. 3d at 1186 (¶23).

¶57. Viewing the evidence in the light most favorable to the verdict, we find that substantial evidence supported Mack's verdict. *See Kirk*, 160 So. 3d at 695-96 (¶25). We therefore find that a rational juror could have found beyond a reasonable doubt that Mack was guilty. *See id.* Accordingly, we find no merit to Mack's assertion that the circuit court erred by denying his motion for a JNOV.

VI. **Whether the jury's verdict was against the overwhelming weight of the evidence.**

¶58. Finally, Mack argues that the circuit court erroneously denied his motion for a new trial because the jury's verdict was against the overwhelming weight of the evidence.

¶59. As Mississippi caselaw provides:

> In reviewing the denial of a motion for a new trial based on an objection to the weight of the evidence, [the appellate] [c]ourt will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. [W]hile the court sits as a thirteenth juror, the motion for [a] new trial is addressed to the discretion

26

of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. As with a sufficiency analysis, when considering the weight of the evidence, the evidence should be weighed in the light most favorable to the verdict.

*Kirk*, 160 So. 3d at 697 (¶31) (internal citations and quotation marks omitted).

¶60. Viewing the evidence in the light most favorable to the verdict, we find "the evidence does not preponderate . . . so heavily against the verdict that to allow it to stand would sanction an unconscionable injustice." *Id.* at (¶33). As a result, we find no error in the circuit court's denial of Mack's new-trial motion. This argument lacks merit.

¶61. **THE JUDGMENT OF THE FORREST COUNTY CIRCUIT COURT OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH SEVENTEEN YEARS TO SERVE, THREE YEARS SUSPENDED, AND THREE YEARS OF POSTRELEASE SUPERVISION, AND TO PAY A FINE OF $2,500 AND AN ASSESSMENT OF $100 TO THE MISSISSIPPI CRIME VICTIMS' COMPENSATION PROGRAM, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**