# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00692-COA

**LAQUON FLUKER A/K/A LAQUON AKEEM FLUKER A/K/A LAQUAN AKEEM FLUKER**       **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2022 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/20/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. On June 21, 2022, Laquon Fluker was convicted of conspiracy to commit aggravated assault of a fellow prison inmate. He was sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections without eligibility for parole or probation. Fluker now appeals, arguing several issues, including insufficient evidence, a wrongful refusal to include a lesser-included-offense jury instruction, inadmissible evidence improperly admitted at trial, insufficient authentication of a prison shank, and cumulative error. Upon review, this Court affirms Fluker's conviction and

sentence.

## FACTUAL BACKGROUND

¶2.     On March 29, 2021, inmate James Bryant was "stabbed" in one of the "Q pod" cells at the Forrest County Adult Detention Center ("the jail"). He alerted the jail authorities about the incident and informed them that a group of inmates, including Laquon Fluker, had "lured" him into a cell and then assaulted him with shanks.  The jail conducted an investigation and identified the five conspirators involved: Fluker, Kenneth Hogan Smith, Tyler Daw, Joseph Reid, and Sean Turner.  On May 10, 2022, a grand jury indicted Fluker for aggravated assault (Count I) and conspiracy to commit aggravated assault (Count II).

¶3.     On June 13, 2022, counsel for Fluker filed a motion to suppress evidence—namely a "fashioned shank" allegedly lacking "chain of custody documentation accompanying the physical weapon."  The motion explained that the State had provided no "conclusive statement or identification that the shank currently in [the State's] possession . . . was in-fact the same shank utilized in this alleged stabbing."  The trial court held a hearing on the motion on June 15, 2022.  The State argued that the shank should be admissible because it would "not be attempting to prove that the fashioned shank that was recovered in Q-pod was the [same] shank used to stab James Bryant."  Instead, the State continued, the shank was "recovered in the same area" where the assault occurred and was "relevant to show the physical characteristics and traits of the shank."  The trial judge took the matter under advisement.[1]

_____

[1] At the motions hearing the court also addressed the State's motion to "exclude the nature of one (1) of the victim's prior felony convictions[.]" The trial judge did not

2

¶4.     Fluker's trial took place on June 20-21, 2022.  The State first called Chiquita Caines, a lieutenant with the Forrest County jail, to testify.  She explained that the jail was separated into "pods" identified "[b]y letters," and there were "[a]bout 20" pods in total.  The pods typically house "24 inmates to one pod" with separate "two men cells[.]"  The jail contained a "common area" where inmates housed within any pod had "the freedom to move about . . . throughout the day."  The individual cells, where the inmates slept and used the bathroom, were not monitored by camera, but "the day room[ and] common area" were always monitored.

¶5.     Caines arrived at the jail on the morning of March 30, 2021, where she "learned that inmate James Bryant had been assaulted in Q pod by several inmates."  In her office drop-box, she found a deposited "fork . . . shaved down on one end to make it pointed and . . . wrapped in cardboard from an item purchased off of canteen and . . . wrapped up with Saran wrap."  Caines agreed with the State that the weapon was "sharpened on one edge" and could be used as a deadly weapon.[2]  She gave the weapon to Greg Holliman, the investigator assigned to the case.  After reading the incident report, Caines "rolled the footage back in an attempt to see where [Bryant] was assaulted and when."  Caines testified that inmates would sometimes fashion weapons out of otherwise unsuspicious objects.  She herself had seen "[h]undreds."

immediately rule on this motion either.  The record is unclear as to how the court ruled, but the State elicited testimony from Bryant on direct examination regarding the nature of his convictions.

     [2] After reviewing the shank, it appears to be a sharpened piece of material wrapped in a nylon string.

¶6.     The surveillance footage from the "lower level" of Q-pod in the jail was admitted into evidence without objection. As the footage was played for the jury, Caines answered questions from the State to explain what the video was showing. In sum, the video showed Reid enter the common area and sit down at a table where inmates played chess. Bryant was stationed "in the bottom right-hand corner" of the screen and stood up to begin "walking to Q-6," referring to the specific cell. Reid then signaled into the Q-5 cell where Fluker and Kenneth Hogan Smith were located. Reid began "pointing towards Q-6[,]" the cell Bryant had just entered. Fluker and Hogan Smith then walked out of Q-5 and toward Q-6. Hogan Smith's right hand was "[i]nside of his boxers" reaching in his waistband. Reid began walking back toward the chess table and tapped Sean Turner on the back. A few seconds later, Turner "got up from the table" and began looking towards Q-6. Around that time, Bryant is seen running out of Q-6 in an attempt to get away before Turner stops him midway to hit him.[3] The video shows that Bryant was able to quickly get away from Turner and run upstairs.[4] Reid started "pointing upstairs," and Hogan Smith, Daw, and Fluker began to go upstairs. The State stopped the video at this point. Still photos taken from the surveillance video were also admitted into evidence without objection.

¶7.     Caines testified that Bryant filed an inmate grievance on March 23, 2021, stating that "one of the officers [was] antagonizing him and several other inmates were saying stuff . . .

_____

[3] Caines did not verbally comment that Turner hit Bryant while the footage was shown in open court, but the video is clear in showing it.

[4] Although Caines did not verbally comment about Bryant running away as the footage was shown in open court, the video is clear in showing it.

4

please do something about this matter because [he was] really thinking about f*cking him up if this happens again."[5] He complained again on March 25, claiming that he was missing funds that were supposed to have "been added to [his] account." He also asked to be moved to another pod "to get away from the ignorance that's on this pod."

¶8. Bryant filed another complaint on March 26, apologizing "for cursing when [he] was asking . . . about moving to G pod." He reiterated his request, stating that he "want[ed] to be where there is some people with some sense and not so childish." Bryant filed additional grievances on March 27 and March 29, warning that "if [he] stab[bed] one of these guys it w[ould] be because of you all . . . reading my message and doing nothing during my situation." Caines testified that Lieutenant Cooley answered the grievances and that they "get grievances like that all the time." On March 30, 2021, Bryant filed a grievance, stating:

> Lt. Caines, Cooley, Major Flowers. Last night I was stabbed on Q pod by Kenneth Smith, Tyler Daw, and almost stabbed by Laquon Fluker. As I ran out of the room to prevent from being stabbed anymore, Sean Turner hit me as I was getting away from danger. He messed up me coming to be stabbed. My left arm got stabbed. I know where they keep their knives. I have info on officers.

¶9. Two days after this incident, Caines spoke to Bryant while "making [her] rounds just checking on the pods." Bryant "came out [of his] cell [and] broke down crying and he told [her] he was stabbed" and "showed [her] a wound in his arm." He identified Hogan Smith, Daw, Turner, Reid, and Fluker as the people responsible for the stabbing. On cross-examination, defense counsel questioned Caines about this testimony that "five co-

---

[5] The jail cells contained monitors, or kiosks, where an inmate could "send medical grievances, sick calls, inmate requests" by using an individualized personal identification number (PIN).

defendants stabbed" Bryant. She responded that she was "just going off what [Bryant] told [her]." Defense counsel noted that the surveillance footage did not show all five men "stabbing" Bryant.

¶10. James Bryant, the victim, was then called to testify. Bryant had been convicted of child exploitation and possession of a controlled substance and was incarcerated at the Forrest County jail at the time of the incident. Bryant resided in Q-pod, which had "six cells on the bottom and six cells on the top." He stated that he "had made some comments to a guy on the zone named Kenneth [Hogan] Smith," and Hogan Smith "and his friends, they didn't like" what he said. Bryant stated that he "guess[ed] they got together and talked about what they were going to do to [him]." Bryant continued, "[T]hey lured me into the room in Q-6 . . . a previous friend of mine had called me in there . . . . I went in there to see what he . . . wanted. And two more people came in there and jumped and stabbed me." He stated that Daw, Hogan Smith, and Fluker were in Q-6 when the attack occurred and identified Hogan Smith and Fluker as the people responsible for stabbing him. Bryant ran out of the room and "was hit by Sean Turner" as he ran to his cell upstairs.[6] Once inside his cell, Bryant went into "lock-down" and "called for the police to come down there to come aid and assist [him]." Bryant "was stabbed twice: . . . [o]nce in the shoulder and once in the arm." A photo of Bryant's shoulder wound that had been taken in the course of the investigation was entered into evidence without objection.

¶11. Bryant described the incident in further detail, stating that Daw had asked him to come

---

[6] The surveillance footage shows Bryant running out of Q-6 and being hit by Turner as he tries to escape.

6

into his cell (Q-6). He entered Q-6 and began a conversation with Daw. As they were speaking, Fluker and Smith entered the cell. Bryant was "sitting on the table that's bolted to the wall in the cell." Fluker "came up to the rear" of Bryant and Smith "sat down at the head of his bed while [Daw] stood at the foot of the bed with his back to [Bryant]." As Bryant got up to leave the cell, "Smith jumped up . . . [and] got in front of [him] and started stabbing [Bryant] . . . . Fluker started stabbing [him] from behind."

¶12. Bryant testified that the weapon "looked like a little knife or like a little shank." He also "believed it was tied up . . . tied up altogether." Bryant stated that it was common to have shanks in Q-pod and that he knew Daw and Hogan Smith had some. "The night that [he] got stabbed," Fluker had one as well. The State showed Bryant the shank that the defense had objected to prior to trial, and he identified it as "the knife [he] got stabbed with." The trial judge ruled "pursuant to 901, an adequate foundation ha[d] been laid for its introduction," so it was introduced as Exhibit 3. The trial judge noted that the defense had objected to the item's admission in a motion in limine before trial, stating that the shank would be admitted "over the objection of the Defendant." The defense did not orally object to the item's admissibility at trial.

¶13. Bryant's injuries were "considered minor injuries . . . puncture wounds." He requested medical attention and "[t]hey brought Band-Aids, alcohol swabs, and they continued treating [him] for probably about a week and a half after that with Band-Aids and cotton swabs and ibuprofen." Concerning his filed grievances, Bryant stated that he filed them "[t]o try to prevent any type of altercation" between himself and anyone else in Q-pod.

There were "several times on the pod that it would come to like arguments between [Bryant] and Laquon Fluker and [he] was just really trying [his] best to try to prevent any type of situation." Bryant's first meeting with the lead investigator Holliman "was probably four or five days after [he] had got stabbed on Q pod."

¶14. Bryant believed that the men involved "conjured up luring [him] into the cell to stab [him]" because they "didn't like the comments" he had made where he suggested that one of the officers was "cool with" Hogan Smith. Bryant gave a handwritten statement on April 9, 2021, which was admitted into evidence over Fluker's objection. Bryant read the statement in its entirety into evidence. Relevant portions to this appeal include Bryant's observation that Hogan Smith, Turner, Daw, and Fluker were "all going into Q6," and started "acting differently than normal." Bryant explained that Daw "call[ed] [him] in to the room Q[-]6," and Fluker and Hogan Smith entered the room "as [they we]re talking." When Bryant began to exit the room, Hogan Smith "come[s and] stands in front of [him] and starts stabbing [him] with something in his hand." Meanwhile, Fluker was "doing the same thing to [Bryant] in [his] back," but Fluker's knife "did not break no skin[.]"

¶15. The State next called Joseph Reid to testify. Reid testified that he was being held in Q-pod at the Forrest County jail at the time of the incident. Bryant, Fluker, Daw, Hogan Smith, and Turner also resided in Q-pod. Bryant had been starting to have disagreements with other inmates in the pod. Reid got together with Daw, Fluker, Turner, and Hogan Smith, and they "decided to get Mr. Bryant off the zone." The plan was to "[l]ure [Bryant] into the room of Q pod 6 . . . and just beat him up . . . rough him up really good and make

8

him catch out on our zone." Daw called for Bryant to come into his room, and Reid "motioned to the other people, to Fluker and [Hogan Smith] to go in the room[.]" Bryant ran out of the cell "screaming he'[d] been stabbed[,]" and Reid stated that he had "never known anything about anybody getting stabbed until the situation was over[]with." He testified further that "[t]here was never a talk about stabbing" anyone, and that was "[n]ever discussed." The "plan" was to "rough him up really bad to make him catch out of our zone." The inmates' "meeting of the minds," as the State called it, lasted "[j]ust a few minutes . . . . [They] talked about it, [and] . . . that was it. And then we decided to do what we did and [he] did [his] part to let everybody know what was going on."

¶16. After the incident, Reid was charged and pled guilty to conspiracy to commit aggravated assault. He was given "five years to serve in prison" following this guilty plea and stated that a condition of that agreement was that he testify "[t]ruthfully and honestly" at Fluker's trial. On cross-examination, Reid stated that he was not surprised that Bryant was stabbed.

¶17. Last to testify for the State was Investigator Greg Holliman with the Forrest County Sheriff's Office. He was brought to the jail on March 30, 2021, after being "advised that there was an incident inside the jail." After speaking with the authorities present, he "recovered a shank that [he] took possession of and maintained possession of" out of Q-pod. Holliman was also able to view the surveillance tape of the incident and "there was audio from Q[-]pod of an individual stating, in fact, that they had attempted to stab Mr. James Bryant." During the video, he observed Reid "ma[k]e contact with Kenneth Smith and

9

Laquon Fluker . . . . [S]econds later they walk out and go in Q-6." Holliman reviewed Bryant's written statement and interviewed him on April 9, 2021. He confirmed that the written statement, the interview, and the surveillance footage were "consistent" with one another.

¶18.    Holliman testified that "[a]ll the evidence was collected and maintained," including the shank recovered from Q-pod. The State showed him the shank already entered into evidence, and Holliman positively identified it as the one he recovered from Q-pod. "It is a sharp object which appears to be maybe a toothbrush wrapped in string to prevent it from sliding through your hand." On cross-examination, defense counsel asked Holliman who found the shank. He explained that "[i]t was recovered by one of the jailers and that's what was brought to [his] attention through Lt. Caines and then it was turned over to [him]." The State rested after Holliman's testimony. The defense made a motion for a directed verdict, which the trial court denied.

¶19.    The defense then proceeded with Fluker's case-in-chief, first calling Adrian Ratliff, who was the shift sergeant at the Forrest County Sheriff's Office at the time of the incident. He testified that "there was a call over the intercom for help" that day and he heard Turner in cell Q-2, "bragging that he attempted to stab [Bryant] in the chest" with a shank, "but Bryant blocked it." Ratliff instructed all available officers to report to the scene, and Ratliff secured the scene once he arrived. He "pulled the individual out, got medical there to treat him, and then he was moved to a different location." While the victim described the attack as a "stabbing[,]" Ratliff stated, "[I]t was more or less a small puncture wound or a scrape"

with "a dab of blood" on what he recalled as Bryant's forearm. A nurse responded and "sterilized [the wound] and put a Band-Aid on it." Bryant was not taken to the hospital. He was, however, "yelling and screaming and complaining, going back and forth with inmates." The shank allegedly used in the incident was never found according to Ratliff. Fluker then attempted to call Hogan Smith, who refused to testify based on his constitutional right against self-incrimination.[7]

¶20.    The trial judge then held a jury instruction conference. Fluker objected to two of the State's proposed instructions, but both objections were overruled. Relevant to this appeal, Fluker proposed a lesser-included-offense simple-assault instruction as to the conspiracy charge. The trial judge refused to give the instruction, stating he did not think "you can go to a simple assault because of how he was indicted and the deadly weapon was used and the only leeway in the simple assault statute by the use of a weapon being simple, if it was used negligently."

¶21.    Following the jury's deliberations, Fluker was acquitted of the aggravated assault charge (Count I) but found guilty of conspiracy to commit aggravated assault (Count II). On June 23, 2022, Fluker was sentenced as a violent habitual offender[8] to life imprisonment in the custody of the Mississippi Department of Corrections without eligibility for parole or probation. He filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial on June 27, 2022; it was denied by the trial court on the following day.

---

[7] Hogan Smith was also called as a witness, but after the court appointed him an attorney, he invoked his right to remain silent and did not testify.

[8] *See* Miss. Code Ann. § 99-19-83 (Rev. 2020).

¶22.    Fluker filed his notice of appeal on July 6, 2022.  On January 4, 2023, Fluker filed a motion to supplement the record on appeal.  This Court granted that request on January 18, 2023, and additional exhibits were attached to the record on appeal.

**DISCUSSION**

¶23.    On appeal, Fluker argues (1) the evidence was insufficient to support his conviction; (2) the trial court erred by refusing a proposed jury instruction; (3) the trial was prejudiced by the improper use of a co-conspirator's guilty plea; (4) the trial was prejudiced by improper lay opinion testimony; (5) the trial court erred in admitting an insufficiently authenticated prison shank; and (6) cumulative error requires reversal.

### I.    Sufficiency of the Evidence

¶24.    Fluker first contends that the evidence was insufficient to support his conviction.  This Court applies a de novo standard of review to challenges to the sufficiency of the evidence. *Tubwell v. State*, 359 So. 3d 249, 250 (¶5) (Miss. Ct. App. 2023) (citing *Sims v. State*, 329 So. 3d 528, 534 (¶20) (Miss. Ct. App. 2021)).  In so doing, "this Court views the evidence in the light most favorable to the State to determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Benthall v. State*, 311 So. 3d 697, 703 (¶20) (Miss. Ct. App. 2021) (citing *Martin v. State*, 214 So. 3d 217, 222 (¶15) (Miss. 2017)).  An important distinction to make before beginning our analysis is that we are only reviewing the sufficiency of the evidence used to convict Fluker of conspiracy to commit aggravated assault, not the aggravated assault itself.  Because Fluker was acquitted of that charge, we only review whether there existed sufficient evidence to convict him of

12

conspiracy to commit aggravated assault.

¶25. To prove that Fluker was guilty of a conspiracy, the State was required to show that "two (2) or more persons conspire[d] . . . [t]o commit a crime[.]" Miss. Code Ann. § 97-1-1(1)(a) (Rev. 2020). "A person is guilty of aggravated assault if he . . . attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev. 2020). Crucial to our review is the long-established precedent that we do not ask whether *this Court* believes the State established the elements of the crime beyond a reasonable doubt. *McCarty v. State*, 247 So. 3d 260, 268 (¶23) (Miss. Ct. App. 2017). Instead, we "will reverse and render if the facts and inferences favor the defendant with such force that *reasonable jurors* could not find him guilty beyond a reasonable doubt." *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023) (emphasis added) (quoting *Smoots v. State*, 310 So. 3d 1184, 1189 (¶17) (Miss. Ct. App. 2020)).

¶26. The State presented numerous pieces of evidence, which, when viewed in the aggregate and in favor of the State, could lead a reasonable juror to find Fluker guilty of the conspiracy beyond a reasonable doubt. The surveillance video clearly showed a concerted effort to accomplish the assault and Fluker responding quickly to a signal from Reid that Bryant had walked into Q-6. Reid himself provided testimony that there was a "meeting of the minds," an agreement, between Fluker and the other men involved to assault Bryant. Finally, Bryant testified as to his version of events where he was "lured" into Q-6 and then attacked shortly afterward. Bryant also testified Fluker stabbed him using the shank that was

13

admitted into evidence. A reasonable juror could have found all elements present for conspiracy to commit an aggravated assault.

## II. Jury Instruction

¶27. Fluker next argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of conspiracy to commit simple assault. This Court employs a de novo standard of review when addressing the refusal of lesser-included-offense instructions. *Curtis v. State*, 298 So. 3d 446, 450-51 (¶11) (Miss. Ct. App. 2020) (citing *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007)). "A defendant has a right to a lesser-included-offense instruction if there is some evidence from which a reasonable juror could find him *both* not guilty of the indicted offense *and* guilty of the lesser-included offense." *Id*. at 451 (¶11) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)). "[L]esser-included-offense instructions should not be granted on mere speculation." *Franklin v. State*, 136 So. 3d 1021, 1026-27 (¶11) (Miss. 2014) (citing *Moody v. State*, 841 So. 2d 1067, 1097 (Miss. 2003)).

¶28. The proposed instruction at issue is D-11, which stated that if the jury were to find Fluker not guilty of conspiracy to commit an aggravated assault, the jury would "then proceed with [their] deliberations to decide whether the State has proved beyond a reasonable doubt all of the elements of the lesser crime of Conspiracy to Commit Simple Assault." The instruction continued:

> If you find beyond a reasonable doubt from the evidence in this case that:
>
> 1. On or about March 29, 2021, in Forrest County;
> 2. Laquon Fluker di[d] willfully, knowingly, intentionally and unlawfully

conspired with:

    a.    Kenneth Hogan [Smith]
    b.    Tyler Daw
    c.    Joseph Reid; AND
    d.    Sean Turner

in that the said Laquon Fluker and the said;

    a.    Kenneth Hogan [Smith]
    b.    Tyler Daw
    c.    Joseph Reid; AND
    d.    Sean Turner

did agree with one another to commit Simple Assault upon James Bryant by causing bodily injury to him then you shall find Laquon Fluker guilty of Simple Assault.

If the State did not prove any one of the above listed elements beyond a reasonable doubt, then you shall find not guilty of count two; to wit, Conspiracy.

The instruction never completed the statutory definition of simple assault. That statute reads:

A person is guilty of simple assault if he or she (i) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; (ii) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (iii) attempts by physical menace to put another in fear of imminent serious bodily harm[.]

Miss. Code Ann. § 97-3-7(1)(a).

¶29. The defense offered two reasons to the trial court in support of giving a simple-assault conspiracy instruction:

First of all, Judge, the simple assault, the wound that was treated by the jail, Ratliff's testimony was it was a Band-Aid injury. It wasn't an aggravated assault serious bodily injury. It was basically a scrape according to Ratliff. That's on the injury. That's on the assault. That would make it simple assault. And then the testimony of Reid was the conspiracy to commit simple assault, he said we're just going to get him in the room and rough him up. He said he knew nothing about a stabbing. So I think that with those factors, those facts, that would create a possibility of a simple assault rather than an aggravated assault. He was very explicit about the testimony when he said we just were going to get him in the room and rough him up. Then he said he was surprised there was a stabbing.

The judge responded:

> The only element under simple assault that would fit, if there is evidence in the record. I mean, that subsection (b) talks about negligently hurting somebody with a deadly weapon. There is no evidence in the record that would qualify. And I think what he was indicted under, they just weren't good at what they were doing or the guy was too quick for them.

¶30. The Mississippi Supreme Court has stated that "[o]nce a deadly weapon is introduced, the distinction between simple and aggravated assault . . . hinges upon whether the injuries were inflicted negligently or intentionally." *Jackson v. State*, 684 So. 2d 1213, 1230 (Miss. 1996) (citing *Hutchinson v. State*, 594 So. 2d 17, 20 (Miss. 1992)). Accordingly, "whether a lesser offense instruction should be given turns on whether there exists an evidentiary basis for it." *Id.*

¶31. "[W]hat the defendants actually did is evidence of what they intended to do." *Griffin v. State*, 480 So. 2d 1124, 1126 (Miss. 1985) (citing *King v. State*, 123 Miss. 532, 86 So. 339 (1920)). The fact remains that Fluker and his co-conspirators entered cell Q-6 with shanks on their persons to carry out an attack on Bryant. What they actually did—attack Bryant with illegally crafted shanks—is evidence of the substance of the conspiracy they formed. The fact that Bryant's injuries were minor makes no difference here. Indeed, our supreme court "has found that, in determining whether the facts support simple, versus aggravated assault, the focus is not exclusively on the harm done, but rather, on whether the elements of the statute are satisfied." *Downs*, 962 So. 2d at 1262 (¶31) (citing *McGowan v. State*, 541 So. 2d 1027, 1029 (Miss. 1989)).

¶32. Reid gave the only testimony suggesting that deadly weapons were not planned to be

16

used, stating the plan was merely to "beat [Bryant] up" and "rough [Bryant] up." But Reid also testified he was not surprised that Bryant was stabbed. Reid testified two of the alleged conspirators brought shanks to the altercation, both stabbing the victim. The jury also saw the shank used by Fluker, which testimony showed was sharpened on one edge and could have been used as a deadly weapon. As the trial judge stated, Fluker's only real avenue to receiving the lesser-included offense instruction was showing negligence on his part. There is nothing in the record that supports a showing of negligence. We therefore agree with the trial court that Fluker was not entitled to a lesser-included-offense instruction of conspiracy to commit simple assault.

### III.    Co-Conspirator's Guilty Plea

¶33.    Fluker next argues that the trial court erred by allowing the State to use Reid's guilty plea as substantive evidence. During Reid's direct examination, the State asked him questions about the plea and its condition that Reid testify at Fluker's trial, as well as the sentence it carried. Fluker did not object to this line of questioning at any point during trial or in his post-trial motions. "The failure to raise an issue at trial waives the right to argue the issue on appeal except in rare cases where a fundamental constitutional right is involved." *Jackson v. State*, 845 So. 2d 727, 729 (¶9) (Miss. Ct. App. 2003) (citing *Maston v. State*, 750 So. 2d 1234, 1237 (¶14) (Miss. 1999)). Fluker's only possible avenue for relief on this issue is plain error.

¶34.    Plain error is defined as "an error so fundamental that it generates a miscarriage of justice." *Mosley v. State*, 930 So. 2d 459, 463 (¶15) (Miss. Ct. App. 2006) (quoting *Morgan*

17

*v. State*, 793 So. 2d 615, 617 (¶9) (Miss. 2001)). "In order to determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Pinter v. State*, 221 So. 3d 378, 384 (¶12) (Miss. Ct. App. 2017).

¶35. A similar question of whether plain error existed involving a co-indictee's guilty plea arose in *Adams v. State*, 350 So. 3d 1116 (Miss. Ct. App. 2022). In *Adams*, the defendant was charged with armed robbery. *Id*. at 1119 (¶1). At trial, the State questioned one of Adams's co-indictees Lindsey "whether he had pled guilty to the armed robbery" and Lindsey answered in the affirmative. *Id*. at 1123 (¶19). On appeal, Adams argued that the trial court "committed plain error" by allowing Lindsey to answer even though he did not raise the issue at the trial level. *Id.* Our Court recognized that a "co-defendant's guilty plea or conviction is generally inadmissible because such plea of guilty or conviction is no evidence of the guilt of the party being tried." *Id*. at 1124 (¶22) (quoting *Harper v. State*, 102 So. 3d 1154, 1161 (¶25) (Miss. Ct. App. 2012)).

¶36. However, this Court held that "[e]vidence of a witness's guilty plea differs from evidence of a prior jury verdict because the latter "creates a danger that the present jury will rely upon the judgment of a prior jury in reaching its decision." *Id*. (citing *Clemons v. State*, 732 So. 2d 883, 890 (Miss. 1999)). "In contrast, evidence of a witness's guilty plea may simply be consistent with the witness's testimony at trial." *Id.* Additionally, "a defendant's opportunity to question a co-indictee regarding his or her guilty plea weighs against a finding of error regarding the admission of evidence regarding those same guilty pleas." *Id*. (citing

18

*Harper*, 102 So. 3d at 1161 (¶25)).

¶37. The Court reasoned that "Adams was able to cross-examine Lindsey, and Lindsey's guilty plea was consistent with his own testimony and other evidence showing that he was guilty of armed robbery." *Id.* As such, the trial court had not committed plain error in allowing the line of questioning. We find the circumstances in Fluker's case practically identical to those in *Adams*. Reid was called as a witness for the State and was available for Fluker to cross-examine him. The record indicates that Fluker brought up the guilty plea on cross-examination, asking Reid whether he "got a pretty sweet deal" to testify. Fluker's counsel also utilized Reid's guilty plea in closing argument, stating that he "got a sweetheart deal" to be present at trial and "had an agenda to testify." Accordingly, this Court cannot find plain error in the State's asking Reid about his guilty plea. Further, Fluker attempted to use the guilty plea to his advantage as well. We find no plain error.

### IV. Improper Lay Opinion Testimony

¶38. Fluker also argues that the State elicited improper lay opinion testimony when questioning Investigator Holliman. In particular, Fluker claims the following exchange was error:

Q: Is there any doubt that there was a conspiracy to commit aggravated assault?

A: No, sir. [Reid] made contact with Kenneth Smith and Laquon Fluker. It was seconds later they walk out and go in Q-6.

He contends that Holliman was not qualified to give his opinion on whether the surveillance video footage showed an aggravated assault occurring because he was not tendered as an

19

expert witness. Notably, Fluker did not object to this questioning at trial. "This Court has held that the failure to raise an objection to evidence presented at trial procedurally bars the issue on appeal." *Clanton v. State*, 365 So. 3d 203, 214-15 (¶41) (Miss. 2023) (citing *Ronk v. State*, 172 So. 3d 1112, 1134 (Miss. 2015)).

¶39.    Fluker thus contends that the admission of this testimony was plain error. Plain error, again, is present if this Court finds that "the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Pinter*, 221 So. 3d at 384.

¶40.    The legal rule at hand "requires lay witness testimony to be rationally based on the witnesses' perception, helpful to understand his testimony or a fact in issue, and not based on expert knowledge, which is controlled by Rule 702." *Gales v. State*, 153 So. 3d 632, 645 (¶44) (Miss. 2014) (citing MRE 701); *see also Roberson v. State*, 569 So. 2d 691, 694 (Miss. 1990) ("Lay witnesses are permitted to give opinions, if based on the perception of the witness and helpful to a clear determination of a fact in issue."). "Common facts on which such opinions are allowed include age, speed, sobriety, and handwriting." *Roberson*, 569 So. 2d at 694-95 (citing T.A. Mauet, *Fundamentals of Trial Techniques* § 4.11 (2d ed. 1988)). "Rule 701 . . . favors the admission of lay opinions when two considerations are met[:] . . . [(1)] the familiar requirement of first-hand knowledge or observation . . . [and (2)] the witness's opinion [is] helpful in resolving the issues." *Gales*, 153 So. 3d at 645-46 (¶44) (citing MRE 701 cmt).

¶41.    The first consideration, "first-hand knowledge or observation[,]" is not present as to

Holliman's testimony in the case at hand. This consideration is "directed as a witness who was actually at the scene of the crime or accident." It is clear from witness reports and Holliman's testimony that he was not present at the jail on the day of the incident. His knowledge was drawn from watching the same surveillance video as the members of the jury did and, thus, is not first-hand. Nor was his opinion testimony necessarily "helpful in resolving the issues." Again, Holliman observed the same footage as everyone else in the courtroom. His opinion was not needed to clarify that Fluker and the other inmates were conspiring to commit an aggravated assault. He had no special knowledge or expertise granting him the ability to say what the video shows with "no doubt." That was a factual question to be resolved by the jury. There was a deviation from a legal rule; thus, the first prong of the plain-error analysis is met.

¶42. The second prong is whether the error was "plain, clear, or obvious." *Pinter*, 221 So. 3d at 384. However, we decline to address this prong because regardless of our conclusion, the third prong—whether "the error prejudiced the outcome of the trial"—fails. We can find no evidence in the record to support a finding that this lone statement from Holliman that there was no doubt Fluker engaged in a conspiracy to commit aggravated assault prejudiced the outcome of Fluker's trial.

¶43. As summarized in our discussion of the sufficiency of the evidence, there were multiple pieces of evidence that supported Fluker's conviction. Bryant stated that he was called into cell Q-6 by Daw, followed by Fluker and Hogan Smith, and stabbed as he tried to leave the cell. The surveillance video also showed a concerted effort by the inmates,

21

including Fluker, to lure Bryant into a cell in order to assault him. It would be rank speculation to conclude that the jury's verdict was based on this one sentence of testimony from Investigator Holliman rather than all the overwhelming evidence of guilt.

### V. Prison Shank Authentication

¶44. Fluker also argues that the physical shank admitted into evidence should have been inadmissible because it was not the assault weapon that the State purported it to be. Although he did not object at trial when the State moved for the shank's admission, he had previously filed a motion to suppress it. Rule 901(a) of the Mississippi Rules of Evidence controls the authentication of physical evidence, and its "fundamental inquiry . . . is whether sufficient evidence exists to enable a reasonable jury to find beyond a reasonable doubt that the evidence is what it is claimed to be." *Id.* (citing *Robinson v. State*, 733 So. 2d 333, 335 (¶6) (Miss. Ct. App. 1998)). Again, Bryant testified that the shank he was shown at trial was the weapon used in his assault.

¶45. As for whether Bryant's identification of the shank was reliable, that is not for this Court to determine. "A party must make a prima facie showing of authenticity, and then the evidence goes to the jury, which ultimately will determine the evidence's authenticity." *Simpson v. State*, 365 So. 3d 997, 1001 (¶16) (Miss. Ct. App. 2022) (citing *Willis v. State*, 309 So. 3d 1125, 1131 (¶11) (Miss. Ct. App. 2020)). Bryant testified that he recognized the weapon because it was used to assault him. The issue then became a question for the jury to decide when deliberating on Fluker's case. This Court "do[es] not reweigh evidence. We do not assess witnesses' credibility. And we do not resolve conflicts between evidence.

22

Those decisions belong solely to the jury." *McCarty*, 247 So. 3d at 269 (¶25) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)). Indeed, "issues of weight and credibility of witness testimony are within the sole province of the jury as fact-finder." *Lyles v. State*, 12 So. 3d 552, 555 (¶15) (Miss. Ct. App. 2009).

¶46. Fluker additionally argues that the shank was inauthentic on the basis of chain-of-custody principles. But this argument fails because Bryant, the victim himself, testified under penalty of perjury that the shank admitted into evidence was the shank used to stab him. "[I]f a witness makes a positive permissible identification of the object that it is what its proponent claims, then there is *no basis* for a chain of custody objection." *Downing v. State*, 981 So. 2d 334, 338 (¶9) (Miss. Ct. App. 2008) (emphasis added) (quoting *Butler v. State*, 592 So. 2d 983, 985-86 (Miss. 1991)). Both of Fluker's arguments as to the admission of the shank are unpersuasive to this Court. This issue is without merit.

## VI. Cumulative Error

¶47. Finally, Fluker contends that the above alleged errors when combined constitute cumulative error. "Under the cumulative-error doctrine, individual errors may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Abram v. State*, 309 So. 3d 579, 586-87 (¶22) (Miss. Ct. App. 2020) (quoting *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007)). "However, where there is no error in part, there can be no reversible error to the whole." *Id.* (quoting *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007)). We find no error in Fluker's conviction or sentencing and, thus, decline to apply the cumulative error doctrine.

**CONCLUSION**

¶48. We find no reversible error in Fluker's conviction of conspiracy to commit aggravated assault. Therefore, we affirm his conviction and sentence.

¶49. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McCARTY AND SMITH, JJ., CONCUR. BARNES, C.J., AND McDONALD, J., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND McDONALD, J.; EMFINGER, J., JOINS IN PART.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶50. I concur that the evidence was sufficient to support the conviction for conspiracy to commit aggravated assault, but I would reverse and remand for a new trial because the evidence also supported Fluker's request for a lesser-included-offense instruction on conspiracy to commit *simple* assault.[9] Therefore, Fluker had an "absolute right" to the instruction, and its refusal was reversible error. *Downs v. State*, 962 So. 2d 1255, 1260 (¶22) (Miss. 2007). Accordingly, I respectfully dissent in part.

---

[9] In many cases, there will be no reason for a defendant to request a lesser-included-offense instruction on a felony conspiracy charge because a conspiracy to commit any felony other than murder, capital murder, and certain drug offenses is subject to the same punishment of imprisonment for not more than five years. Miss. Code Ann. § 97-1-1 (Rev. 2020). Here, however, Fluker requested a lesser-included-offense instruction on conspiracy to commit simple assault, a *misdemeanor*, which is punishable by incarceration for not more than six months in the county jail. *Id.* § 97-1-1(4); Miss. Code Ann. § 97-3-7(1)(a) (Rev. 2020). Moreover, Fluker was indicted as a violent habitual offender, which meant that a conviction for felony conspiracy would result in a sentence of life imprisonment without eligibility for parole. Miss. Code Ann. § 99-19-83 (Rev. 2020). The violent habitual offender statute does not apply to misdemeanor sentences, *Pinter v. State*, 221 So. 3d 378, 392-93 (¶¶41-42) (Miss. Ct. App. 2017), so a conviction for misdemeanor conspiracy still would have resulted in no more than six months in the county jail. Thus, Fluker's request for a lesser-included-offense instruction mattered a great deal in this case.

¶51. The facts relevant to Fluker's request for a lesser-included-offense instruction can be summed up succinctly. James Bryant testified that as he was leaving cell Q-6 at the Forrest County jail, "Kenneth Smith jumped up and . . . got in front of me and started stabbing me and I felt Laquon Fluker start stabbing me from behind. And I pushed him off of me and I ran out of the cell." According to Bryant, he was stabbed with something that "looked like a little knife or like a little shank." Bryant identified the "shank" in evidence as "the knife [he] got stabbed with," stating that he had "seen it that night." It is not clear whether Bryant meant that Smith or Fluker used this particular shank. Deputy Adrian Ratliff noted that although Bryant referred to the incident as a "stabbing," his wound "was more or less a small puncture wound or a scrape." There was a "dab of blood," and a nurse treated the wound with a band-aid. Joseph Reid testified that he, Fluker, and three other men had previously agreed "[j]ust to rough [Bryant] up really good." According to Reid, they had "come up with the plan just to beat [Bryant] up," they were "supposed to have just beat him up," and "[t]here was never a talk about stabbing no one"—stabbing was "[n]ever discussed."

¶52. Fluker was indicted for aggravated assault (Count I) and conspiracy to commit aggravated assault (Count II). The jury acquitted Fluker of Count I.

¶53. As to Count II, the court instructed the jury that Fluker was guilty of conspiracy to commit aggravated assault if (1) Fluker "[m]ade a voluntary agreement with [Smith, Tyler Daw, Reid, and Sean Turner] to commit aggravated assault, a crime"; (2) "[b]y voluntarily agreeing with [Smith, Daw, Reid, and Turner] to cause bodily injury to . . . Bryant by cornering him and stabbing him"; and (3) "Fluker knew the act to be illegal."

25

¶54. Fluker requested a jury instruction on the lesser-included offense of conspiracy to commit simple assault. Fluker's proposed instruction stated that he was guilty of conspiracy to commit simple assault if he conspired and agreed with Smith, Daw, Reid, and Turner "to commit Simple Assault upon . . . Bryant by causing bodily injury to him." Fluker argued that he was entitled to this instruction based primarily on Reid's testimony that the conspirators only intended to "rough [Bryant] up" or "beat him up" and that a stabbing was "[n]ever discussed." The trial judge refused the instruction, stating that the shank clearly was a "deadly weapon" and that there was no proof that Bryant "negligently got stabbed." On appeal, Fluker argues that the refusal of the instruction was reversible error.

¶55. When a defendant argues "that he was entitled to a lesser-included offense instruction, we conduct de novo review, as this is a question of law." *Downs*, 962 So. 2d at 1258 (¶10). "[A] defendant has an absolute right to have the jury instructed on . . . lesser-included offenses if the evidence supports such an instruction, and there is reversible error in not giving the lesser-included offense instruction." *Id.* at 1260 (¶22) (quotation marks omitted). When we review the refusal of a lesser-included-offense instruction, "[w]e must view the evidence in the light most favorable to the defendant, draw all reasonable inferences in his favor, and take into account that the jury may not be required to believe any evidence offered by the State." *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013) (quotation marks omitted). A defendant is entitled to such an instruction if he can "point to *some evidence* in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Id.*

26

(emphasis added) (quoting *Goodnite v. State*, 799 So. 2d 64, 69 (¶24) (Miss. 2001)). The instruction must be given "if a 'rational' or 'reasonable' jury could find the defendant not guilty of the principal offense charged in the indictment, yet guilty of the lesser-included offense." *Downs*, 962 So. 2d at 1261 (¶28) (quoting *Monroe v. State*, 515 So. 2d 860, 863 (Miss. 1987)).

¶56. Fluker was entitled to a lesser-included-offense instruction because a rational jury could have found him not guilty of conspiracy to commit aggravated assault, yet guilty of conspiracy to commit simple assault. Reid testified that the conspirators only agreed to "rough [Bryant] up" or "beat him up" and that stabbing Bryant was "[n]ever discussed." A rational jury could have found that Reid's testimony described an agreement to commit a simple assault but not an aggravated assault. Therefore, Fluker had an "absolute right" to the instruction. *Id.* at 1260 (¶22).

¶57. The majority states that an instruction on conspiracy to commit simple assault was not warranted because one or more of the conspirators were armed with shanks when they assaulted Bryant. *Ante* at ¶¶31-32.[10] But the essence of a conspiracy is the *agreement* to commit the crime, not any subsequent criminal activity. *State v. Thomas*, 645 So. 2d 931, 933 (Miss. 1994) ("A conspiracy is a separate, complete offense and the crime is completed once the agreement is formed . . . ."). Based on Reid's testimony, a rational jury could have found that Fluker *agreed* to commit only a simple assault, not an aggravated assault, even if

---

[10] As discussed above, Bryant claimed that he "felt . . . Fluker start stabbing [him] from behind" as Bryant fled the cell. However, the jury acquitted Fluker of aggravated assault.

27

Bryant was later stabbed during the assault.

¶58. The trial judge also stated that a jury instruction on conspiracy to commit simple assault was not warranted because there was no "proof that [Bryant] negligently got stabbed." The judge was referring to the distinction between "purposely or knowingly caus[ing] bodily injury to another with a deadly weapon," which is aggravated assault, and "negligently caus[ing] bodily injury to another with a deadly weapon," which is simple assault. Miss. Code Ann. § 97-3-7(1)(a)(ii) & (2)(a)(ii). In the trial judge's view, there was no basis for an instruction on conspiracy to commit simple assault because the shank was clearly a "deadly weapon," and Bryant was stabbed intentionally, not "negligently." But, again, based on Reid's testimony, a rational jury could have found that there was no agreement to stab Bryant—i.e., no agreement to assault Bryant with a deadly weapon. Reid's testimony provided a basis for the lesser-included-offense instruction.

¶59. In addition, although not raised by Fluker at trial, there is another reason that a rational jury could have found him not guilty of conspiracy to commit aggravated assault yet guilty of conspiracy to commit simple assault. A rational jury could have found that the shank in evidence is not a deadly weapon.[11] Under Mississippi law, a "deadly weapon" is any object

---

[11] An aggravated assault can be committed without the use of a deadly weapon, *see* Miss. Code Ann. § 97-3-7(2)(a)(ii), but in this case the State proceeded solely on the theory that the shank was a deadly weapon. The elements instruction for Count I, aggravated assault, specifically required the jury to find beyond a reasonable doubt that the "shank was a deadly weapon," and a separate instruction defined "deadly weapon." As discussed above, the jury acquitted Fluker of Count I. The elements instruction for Count II, conspiracy to commit aggravated assault, did not specifically require the jury to find that Fluker agreed to assault Bryant with a deadly weapon, though it did require the jury to find that Fluker agreed "to commit aggravated assault, a crime."

that "when used as a weapon, is, under the existing circumstances, reasonably capable or likely to produce death or serious bodily harm to a human being upon whom the object, article, or means is used as a weapon." *Mack v. State*, 237 So. 3d 778, 791 (¶49) (Miss. Ct. App. 2017) (brackets omitted). Moreover, it is "long-standing principle that *it is the jury's responsibility to decide if an instrument constitutes a deadly weapon*." *Franklin v. State*, 136 So. 3d 1021, 1028 (¶29) (Miss. 2014) (emphasis added).

¶60. The Mississippi Supreme Court and this Court have applied this principle in a number of cases. For example, in *Franklin*, the defendant was convicted of aggravated assault based on evidence that he beat the victim's head and body with a liquor bottle. *Id.* at 1025-26 (¶¶4-9). But on appeal, the Supreme Court held that the trial court "improperly presumed that the bottle was a deadly weapon" and erred "by not allowing the jury to consider the lesser-included-offense instruction of simple assault." *Id.* at 1027-28 (¶¶13, 20). The Supreme Court ordered a new trial because it could not "say that it would be impossible for a reasonable juror to find . . . that the bottle was not a deadly weapon." *Id.* In *Buchanan v. State*, 84 So. 3d 812 (Miss. Ct. App. 2011), where the defendant beat the victim with a baseball bat, this Court held that the trial court properly instructed the jury on the lesser-included offense of simple assault because "the question of whether an instrument used in an assault is a deadly weapon is a question of fact for the jury to determine." *Id.* at 817 (¶12). In *Jackson v. State*, 174 So. 3d 232 (Miss. 2015), the Supreme Court held that whether a knife with a three-inch blade constituted a deadly weapon for purposes of the robbery statute was "strictly a question of fact for the jury to decide." *Id.* at 239 (¶24). Finally, in *Spann v.*

*State*, 797 So. 2d 365 (Miss. Ct. App. 2001), an inmate stabbed a corrections officer with a shank—a "hard plastic toothbrush [that] had been filed down to a sharp point"—that "broke the [officer's] skin and caused [him] to bleed." *Id.* at 367 (¶¶4, 9). On appeal, this Court stated, "The toothbrush was admitted into evidence and the jurors could determine if [it was a deadly weapon]. An instruction was given on simple assault, which was an appropriate lesser-included offense [of aggravated assault] if the jurors did not accept that the sharpened toothbrush [was a deadly weapon]." *Id.* at (¶9).

¶61.    The shank in evidence in this case was described as "a fork that was shaved down at one end to make it pointed." It is halfway wrapped in cardboard, string, and/or saran wrap, forming a handle of sorts. The "blade" of the shank is about two inches long and does not appear exceptionally sharp. I would say it looks sort of like a short, plastic letter opener. Whether the shank constituted a "deadly weapon" was a question for the jury to determine.

¶62.    In summary, although the evidence was sufficient to support the conviction, the evidence also supported Fluker's request for a lesser-included-offense instruction on conspiracy to commit simple assault. As such, Fluker had an "absolute right" to the instruction, and its refusal was reversible error. *Downs*, 962 So. 2d at 1260 (¶22). Therefore, I respectfully dissent in part.

**BARNES, C.J., AND McDONALD, J., JOIN THIS OPINION. EMFINGER, J., JOINS THIS OPINION IN PART.**